**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

**U.S. MINING, INC.,**

      **Plaintiff,**

  **v.**                                                    **Civil Action No. 3:24cv894**

**NESTLE PURINA PETCARE**
**COMPANY,**

      **Defendant.**

## MEMORANDUM OPINION

This matter comes before the Court on Defendant Nestle Purina PetCare Company's ("Nestle/Purina") Motion to Dismiss Complaint (the "Motion to Dismiss" or "Motion").[1] (ECF No. 7.) Plaintiff U.S. Mining, Inc. ("USM") responded in opposition, (ECF No. 9 (under seal); *see also* ECF No. 17 (publicly available version of ECF No. 9 with footnote two redacted)), and Defendant replied, (ECF No. 10).

The matter is ripe for disposition. The Court dispenses with oral argument because the materials before it adequately present the facts and legal contentions, and argument would not aid in the decisional process.

For the reasons articulated below, the Court will grant the Motion.

### I. Factual and Procedural Background

USM brings this action against Nestle/Purina for breach of contract and negligent misrepresentation under Virginia law. (ECF No. 1-1, at 40–51.)

---

[1] The Court employs the pagination assigned by the CM/ECF docketing system.

A.    **Factual Allegations**[2]

1.    **On January 1, 2010, USM Begins Performing Mining Services for Nestle/Purina**

In October 2009, USM[3] and Nestle/Purina entered into a Service Agreement (the "2010 Contract"). (ECF No. 1-1, at 55–62 (Ex. 1); ECF No. 1-1, at 8 ¶ 6 (Compl.).)  Pursuant to the 2010 Contract, USM agreed to provide mining services at Nestle/Purina's King William, Virginia mine beginning January 1, 2010.  (ECF No. 1-1, at 8 ¶¶ 6, 9 (Compl.); *see* ECF No. 1-1, at 55, 74 (Ex. 1).)  Later, the parties entered a second contract that took effect on February 1, 2020 (the "2020 Contract"), extending USM's contractual relationship with Nestle/Purina through December 31, 2025.  (ECF No. 1-1, at 8 ¶¶ 7, 9 (Compl.); *see* ECF No. 1-1, at 76, 94, 118 (Ex. 2).)

On January 1, 2010, "USM began providing mining services for [Nestle/Purina]."  (ECF No. 1-1, at 8 ¶ 6 (Compl.).)  Among the several contractual responsibilities outlined in the 2010 Contract, this lawsuit stems from USM's mining of montmorillonite clay—a material used by Nestle/Purina to manufacture cat litter—and the removal of topsoil and other matter (known as "overburden") to uncover and extract the montmorillonite clay.  (ECF No. 1-1, at 8 ¶¶ 10–12, 10

---

[2] In considering the Motion to Dismiss, the Court will assume the well-pleaded factual allegations in the Complaint to be true and will view them in the light most favorable to USM. *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993); *see also Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992).  To the extent the Complaint's allegations conflict with the content of an exhibit, "the exhibit prevails." *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016) (quoting *Fayetteville Invs. v. Com. Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir.1991)).

[3] The original parties to the 2010 Contract were Nestle/Purina and Cross-Land Harbour, Inc., a Virginia corporation that dissolved following its merger with USM.  (ECF No. 1-1, at 8 ¶¶ 3–6 (Compl.); ECF No. 1-1, at 55 (Ex. 1).)  USM's cause of action arose after USM and Cross-Land Harbour, Inc. (collectively, "USM"), began providing mining services to Nestle/Purina during the contractual period.  (ECF No. 1-1, at 7 ¶ 5 (Compl.).)

¶ 21 (Compl.).)  Pursuant to the 2010 Contract, USM billed Nestle/Purina on a biweekly basis for the quantity of overburden it removed during its efforts to extract montmorillonite clay. (ECF No. 1-1, at 8 ¶¶ 10–12, 10 ¶ 22, 12 ¶ 32 (Compl.).)  Nestle/Purina consistently paid these invoices.  (ECF No. 1-1, at 12 ¶ 31 (Compl.).)

"In 2011, USM employed a third-party contractor to move overburden."  (ECF No. 1-1, at 12 ¶ 37 (Compl.).)  "The third-party contractor determined the quantity of overburden removed by use of a ground-based GPS system."  (ECF No. 1-1, at 12 ¶ 38 (Compl.).)  USM then billed Nestle/Purina based on these measurements.  (ECF No. 1-1, at 12-13 ¶¶ 37–38 (Compl.).)

### 2. In 2012, Nestle/Purina Hires a Third-Party Consultant to Verify the Total Amount of Overburden USM Removed in 2011

In 2012, Nestle/Purina hired its own third-party consultant, Draper Aden Associates ("DAA"), to use "photogrammetry" survey data ("the DAA data") to "determine the amount of total overburden" that Nestle/Purina "contended USM had removed . . . during each preceding period[.]"  (ECF No.1-1, at 10-11 ¶¶ 26–27, 13 ¶ 39 (Compl.).)  DAA's survey of the overburden removed in 2011 indicated that USM had removed 36,013 cubic yards of overburden less than its initial invoices indicated, totaling $91,008.51 in overpayments by Nestle/Purina in 2011.  (ECF No. 1-1, at 13 ¶¶ 40–41, 39 ¶¶ 147–48 (Compl.).)

Despite USM's "skeptic[ism] about the discrepancy claimed by Nestle/Purina for 2011, USM accepted" Nestle/Purina's estimates on the true amount of overburden removed.  (ECF No. 1-1, at 13-15 ¶ 45 (Compl.).)  Given the mutual agreement between the parties to reimburse each other for any discrepancy between the total amount of overburden removed,[4] USM returned

---

[4] After approximately 2012, Nestle/Purina would have DAA provide data via "photogrammetry" to calculate the total amount of overburden it claimed was removed annually.

$91,008.51 to Nestle/Purina.[5]  (ECF No. 1-1, at 13 ¶¶ 41, 43 (Compl.).)  Following this

discrepancy in 2011 measurements, the parties agreed to set the biweekly invoices by measuring

the removed overburden "per bank cubic yard"[6] as determined by DAA's annual survey

provided to USM by Nestle/Purina.  (ECF No. 1-1, at 10 ¶ 23, 12 ¶ 34, 13 ¶¶ 42–43 (Compl.).)

This payment structure persisted for the remainder of the 2010 Contract.  (ECF No. 1-1, at 13 ¶

42 (Compl.).)

### 3.    USM Becomes Increasingly Skeptical of the DAA Data

Following the adoption of the "per bank cubic yard" pay structure for interim payments,

USM "immediately" had concerns with how DAA was collecting its data for the annual survey

the resulted in the biweekly invoices.  (ECF No. 1-1, at 10 ¶ 24, 13 ¶ 44, 15 ¶ 49 (Compl.).

DAA's data showed that "the average quantity [of overburden] per truckload" that USM

---

"If the amount calculated was different than the amount that had been billed by USM, then there would be an adjustment:  if USM had underestimated the volume of overburden removed, then [Nestle/Purina] would pay USM the difference, and if USM had overestimated the total volume of overburden removed, then USM would be required to reimburse [Nestle/Purina] for the difference." (ECF No. 1-1, at 13 ¶ 43 (Compl.).)

[5] The dollar amount Nestle/Purina paid was based on the tiered payment scale per bank cubic yard of overburden removed by USM.  (*See* ECF No. 1-1, at 73 ¶ 1 (Ex. 1).)

[6] Except for 2011, USM calculated the amount of overburden removed by multiplying (1) "the number of truckloads of overburden removed" by (2) "a cubic yards per truckload figure determined in a manner prescribed by" Jim Job, a Nestle/Purina employee.  (ECF No. 1-1, at 12 ¶ 34 (Compl.).)

To calculate the number of cubic yards per truckload, the parties used a formula (referred to by USM as the "[Jim] Job Formula") dividing "the total cubic yards of overburden removed during the prior year, as determined by [Nestle/Purina's] consultant (DAA), by the number of truckloads hauled that year." (ECF No. 1-1, at 12 ¶ 35 (Compl.).)  "This calculation—total cubic yards moved in year 1 divided by total truckloads in year 1—would then provide the cubic yards per truckload value that USM should use for its interim payment calculations (the 'Job Formula')." (ECF No. 1-1, at 12 ¶ 35 (Compl.).)

4

removed "varied each year." (ECF No. 1-1, at 15 ¶ 50 (Compl.).) As a result, DAA's data showed that USM removed overburden "in truckload volumes much lower than the fully loaded capacity of the trucks [USM] utilized." (ECF No. 1-1, at 15 ¶ 51 (Compl.).) According to USM, however, USM did not vary the amount of overburden it removed annually. Throughout the duration of the 2010 Contract and 2020 Contract, USM retained the same employees, used the "same haul trucks," and provided clear directives "to fully load each truck of overburden" to its maximum capacity. (ECF No. 1-1, at 15-16 ¶¶ 47, 52 (Compl.).)

Because DAA's data did not accurately capture the amount of overburden USM removed annually, USM concluded that the DAA data "had to be wrong." (ECF No. 1-1, at 15 ¶ 49 (Compl.).) However, USM continued to accept the DAA data when calculating Nestle/Purina's biweekly invoices despite its "belief that it was not receiving credit for the full amount of overburden it had actually removed each year." (ECF No. 1-1, at 15 ¶ 46, 16 ¶ 53 (Compl.).)

### 4.    USM Begins to Investigate the DAA Data in 2020

In early 2020, USM hired Rish Equipment ("Rish") "to conduct an independent survey to determine the actual quantity of overburden moved" for the calendar years 2016, 2018, and 2019 (the "2021 Study").[7] (ECF No. 1-1, at 16 ¶ 55, 17 ¶ 66 (Compl.).) According to the 2021 Study, Rish "indicated that the real quantity of each truckload was significantly greater than what had been historically determined by" the DAA data, including during the "prior years covered by the 2010 Contract." (ECF No. 1-1, at 16 ¶ 56, 19 ¶ 69 (Compl.).) USM further employed two additional third-party contractors to verify the validity and conclusions made in the 2021 Study

---

[7] The 2021 Study (and all future reviews of overburden removal data) does not provide data for the 2017 calendar year because USM did not remove any overburden during that period. (ECF No. 1-1, at 247 (Ex. 12).)

by removing potential interfering variables, the outcomes of which all "supported the 2021 Study." (ECF No. 1-1, at 31 ¶ 106 (Compl.); ECF No. 1-1, at 120 (Ex. 3).)

In 2021, DAA changed its overburden measurement system which produced results showing that USM had removed a much greater amount of overburden than in previous years and was more "in line with what USM believed to be the true quantity of overburden it was moving in each truckload." (ECF No. 1-1, at 16-17 ¶¶ 58–59, 61 (Compl.).) Following these new calculations, USM began to vocalize its "longstanding belief that [Nestle/Purina] or [DAA] had made computational errors when calculating the cubic yardage of overburden removed each year that consistently resulted in an understatement of quantity removed" and $1,214,612.10 in underpayments by Nestle/Purina during the three-year 2021 Study testing period (2016, 2018, and 2019).[8] (ECF No. 1-1, at 17-19 ¶¶ 65–66 (Compl.).)

### a. USM's Initial May 2021 Meeting with Nestle/Purina and Subsequent Data Requests

On May 18, 2021, USM presented the findings of Rish's 2021 Study to Nestle/Purina during an in-person meeting with Nestle/Purina's representatives. (ECF No. 1-1, at 19 ¶¶ 68–69 (Compl.).) After this briefing, Nestle/Purina's representatives informed the president of USM, Matt Heldreth, "that if it was determined that there had been an error, then [Nestle/Purina] would make good on any underpayment," including a statement by Nestle/Purina's Divisional Mining Manager Tony Parrish that "if we missed something, we'll get you paid." (ECF No. 1-1, at 19-

---

[8] USM calculated the monetary amount of Nestle/Purina's underpayments by using the 2021 Study's measurements of overburden removed for the calendar years 2016, 2018, and 2019, totaling $1,214,612.10. (ECF No. 1-1, at 17–19 ¶¶ 65, 67 (Compl.).) For the remaining years covered by the 2010 Contract but "not addressed in the 2021 Study," USM calculated the difference in overburden removed and its corresponding cost "in the same manner" as the 2021 Study, resulting in a total underpayment of $527,225.92 covering calendar year 2011 through 2015. (ECF No. 1-1, at 19 ¶ 67 (Compl.).)

21 ¶ 69 (Compl.).)  Nestle/Purina also asserted that it would instruct DAA "to release all flight data from the aerial surveys to both USM and anyone USM chose to review the flight data" so USM could perform a thorough analysis.  (ECF No. 1-1, at 21 ¶ 70 (Compl.).)

"In reliance upon [Nestle/Purina's] assurance that it would be paid for any prior underpayments for overburden removed during the course of the 2010 contract," USM continued to "spend considerable sums" in accumulating evidence to convince Nestle/Purina of its underpayment throughout the 2010 Contract period.  (ECF No. 1-1, at 21 ¶ 71 (Compl.).)  USM asked Mr. Parrish to instruct DAA to release the DAA data to Mike Anthony of Rish Equipment to review the photogrammetry, a request that Mr. Parrish forwarded to DAA on June 3, 2021 with an instruction to "provide the necessary data."  (ECF No. 1-1, at 21 ¶¶ 71–72 (Compl.).)  After several months without any substantive response to USM's request for data, Nestle/Purina emailed USM on November 3, 2021, stating that it "would not provide the data previously promised, that [Nestle/Purina] believed its prior measurements to be accurate and that the 2010 Contract did not require [Nestle/Purina] to provide any such data to USM."  (ECF No. 1-1, at 22 ¶ 76 (Compl.).)

      **b.**    **USM's Subsequent Negotiations with Nestle/Purina Result in a Standstill**

USM responded to Nestle/Purina's November 3, 2021 email asking Mr. Parrish and Amy Kerr, a Nestle/Purina Vice President, for another meeting to further discuss disclosing "broad access to DAA's survey data."[9]  (ECF No. 1-1, at 22-23 ¶ 77 (Compl.).)  The meeting ultimately

---

[9] USM outlined its concerns regarding DAA's data in a letter dated November 17, 2021. That letter delineated several deficiencies in Nestle/Purina's actions including that (1) Nestle/Purina had promised to give USM access to DAA's survey data; (2) that promise had been confirmed by a Nestle/Purina email to DAA; (3) the DAA data was never provided despite USM confirming the necessity for it; (4) that any claim by Mr. Parrish that a meeting in addition to the May 18, 2021 had occurred was false; and, (5) "after May 18, 2021 the [Nestle/Purina] approach

took place on December 1, 2021. (ECF No. 1-1, at 23 ¶ 78 (Compl.).) During the meeting,

USM reiterated its desire for full access to the DAA data, prompting Nestle/Purina Vice

President Kerr to instruct "Mr. Parrish to get USM what data it needed" and to state that "'[i]f we

owe you, we will pay you.'" (ECF No. 1-1, at 23 ¶ 79 (Compl.).) However, Mr. Parrish

"categorically refused" to provide the DAA data to USM at a subsequent meeting on December

15, 2021, despite USM's contractor's statements that "it would be impossible to determine

volume data" for their studies without such data. (ECF No. 1-1, at 23 ¶ 81 (Compl.).) In a

December 29, 2021 letter, USM accused Nestle/Purina of "stonewalling", of refusing to allow a

"true reconciliation of the past aerial surveys', and of hiding "something" by its continued

refusal to provide the DAA data. (ECF No. 1-1, at 23–25 ¶ 82 (Compl.).) Nestle/Purina did not

acknowledge receipt of the December 29, 2021 letter. (ECF No. 1-1, at 25 ¶ 83 (Compl.).)

### c.    USM and Nestle/Purina Sign an Additional Agreement in November 2022 to Release Limited DAA Data to USM's Contractors

Negotiations between the parties stalled until February 15, 2022, when Mr. Parrish

invited USM to attend a conference call to discuss hiring an independent third party jointly to

analyze the DAA data. (ECF No. 1-1, at 25 ¶ 84 (Compl.).) On May 12, 2022, Mr. Parrish sent

USM a proposed "Letter Agreement" for the transfer of the DAA data from Nestle/Purina "to

move forward with [USM's] request to review survey data." (ECF No. 1-1, at 25 ¶ 85

(Compl.).) In pertinent part, the May 12, 2022 Letter Agreement contained a statute of

limitations provision, stating:

> For the avoidance of doubt, nothing in this Letter Agreement shall be construed to
> amend, extend or otherwise modify the statute of limitations for any claim or cause

---

seemed to have become a decision to stonewall USM's efforts to obtain needed data." (ECF No.
1-1, at 22 ¶ 77 (Compl.).)

of action related to the [2020 Contract] or [2010 Contract], or any conduct performed pursuant to either such agreement.

(ECF No. 1-1, at 25 ¶ 85, 27 ¶ 92 (Compl.) (brackets in original).)

From June to August 2022, a series of negotiations between USM and Nestle/Purina took place regarding the details of the Letter Agreement during which USM firmly requested that the final agreement not contain a statute of limitations provision regarding USM's ability to file a claim regarding potential breaches of the 2010 Contract. (ECF No. 1-1, at 25–27 ¶¶ 86–95 (Compl.).) For instance, a June 22, 2022 response from USM included a revised Letter Agreement that specifically "eliminat[ed] the paragraph that addressed the statute of limitations." (ECF No. 1-1, at 26 ¶ 87 (Compl.).)

On July 28, 2022, during a visit to the mining site and as part of the Letter Agreement negotiations between the parties, Nestle/Purina Vice President Kerr repeated her sentiment that "if we owe you, we will pay you." (ECF No. 1-1, at 26 ¶ 88–90 (Compl.).) After that, on August 12, 2022, Nestle/Purina sent a new proposed Letter Agreement that reinstated the earlier statute of limitations language providing that nothing in the agreement would amend, extend or modify the statute of limitations for any claim related to the 2010 and 2020 Contracts. (ECF No. 1-1, at 26 ¶ 92 (Compl.).) When Nestle/Purina counsel advocated for the statute of limitations language "because the statute of limitations has elapsed on some claims", USM responded that Nestle/Purina in-house counsel should review Vice President Kerr's statements because "she had stated on multiple occasions that if [Nestle/Purina] had been wrong [it] would make it right." (ECF No. 1-1, at 27 ¶ 93 (Compl.).) On August 23, 2022, Mr. Parrish emailed a letter of agreement that the parties had "reviewed in [their] meeting last week" in which "Section 9 [i.e. the statute of limitations provision)] ha[d] been deleted per [USM's] request." (ECF No. 1-1, at 27 ¶ 94 (Compl.).)

After subsequent changes regarding the wording of certain provisions, on November 28, 2022, both parties agreed to the final version of the Letter Agreement (the "November 2022 Agreement") in which Koontz Bryant Johnson Williams ("KBJW") was named as the independent third party charged with reviewing the DAA data. (ECF No. 1-1, at 25 ¶ 84, 27 ¶ 95 (Compl.); ECF No. 1-1, at 239 (Ex. 11).) The November 2022 Agreement did not contain a statute of limitations provision but did contain a stipulation stating that:

> The parties agree that should the Data indicate any discrepancy that would justify an increase or decrease in the amount owed to USM for overburden removal [between 2016 and 2021] they shall negotiate in good faith to mutually agree on a resolution.

(ECF No. 1-1, at 239 (Ex. 11); *see also* ECF No. 1-1, at 27–29 ¶¶ 94–96 (Compl.).)

### 5.    In March 2023, USM and Nestle/Purina's Relations Falter Following KBJW's Final Report

In March 2023, KBJW provided both USM and Nestle/Purina with its final report ("the KBJW Report") analyzing the DAA data, concluding, in part, that "significant errors were made for the calculation of overburden" and that such errors "may have been made over multiple years."[10] (ECF No. 1-1, at 260 (Ex. 12); *see* ECF No. 1-1, at 32 ¶ 113 (Compl.).) For example, KBJW's report surveyed USM's removal of overburden in 2020, 2021, and 2022. These surveys supported USM's assertion that DAA made errors in the calculation of the amount of overburden USM removed. (ECF No. 1-1, at 29–30 ¶ 101 (Compl.).) KBJW concluded that fluctuations in DAA's data "clearly indicate[d] that adjustment errors were made." (ECF No. 1-1, at 34 ¶ 121 (Compl.).)

---

[10] The KBJW Report used DAA "topographic flight data for six end-of-year surveys," comprising the years "2015, 2016, 2018, 2019, 2020, and 2021." (ECF No. 1-1, at 247 (Ex. 12).) Nestle/Purina, however, did not authorize DAA to disclose "any data obtained prior to 2015 or any site boring logs" to KBJW. (ECF No. 1-1, at 31–32 ¶ 111 (Compl.).)

On May 3, 2023, Nestle/Purina confirmed that it received the KBJW Report and, despite its previous agreement to use KBJW as an independent third-party, Nestle/Purina informed USM of its desire to retain its own surveyor to examine the DAA data and the accuracy of the KBJW Report. (ECF No. 1-1, at 35 ¶ 127 (Compl.); ECF No. 1-1, at 279 (Ex. 17).) Nestle/Purina's chosen surveyor, Timmons Group ("Timmons"), met with KBJW three separate times and produced two reports for Nestle/Purina between approximately September to December 2023, during which Timmons communicated with KBJW and USM that its findings were relatively consistent with the KBJW Report. (ECF No. 1-1, at 35–37 ¶¶ 129–39 (Compl.).) KBJW provided information to Timmons to ensure that Timmons could conduct accurate calculations. (ECF No. 1-1, at 35–36 ¶¶ 130–37 (Compl.).) When asked by a KBJW employee on December 4, 2023 if anything in the KBJW Report was inaccurate, a Timmons representative "only stated that he 'needed to do more calculations.'" (ECF No. 1-1, at 36–37 ¶ 138 (Compl.).) The Timmons representative further stated that Nestle/Purina was committed to "resolving" the issues between the parties and that "whatever we figure out as being the problem, they're willing to, you know, to step up and take care of whatever it is." (ECF No. 1-1, at 35 ¶ 129, 37 ¶ 139–40 (Compl.).)

Despite USM's expectations, Timmons' final report for Nestle/Purina concluded that there were no errors with the DAA data. (ECF No. 1-1, at 274–77 (Ex. 16); *see* ECF No. 1-1, at 37 ¶ 141 (Compl.).) On January 30, 2024, Nestle/Purina sent USM a letter that it "stands by the quantities determined by DAA in its prior measurements." (ECF No. 1-1, at 37 ¶ 141 (Compl.); *see* ECF No. 1-1, at 274 (Ex. 16).) USM responded on February 7, 2024, alleging that Nestle/Purina was engaging in "extreme bad faith" in its attempts to resolve their payment dispute and highlighting USM's firm belief that "it has not been fairly and fully compensated for

11

the services that it has provided to [Nestle/Purina] since their contractual relationship began."

(ECF No. 1-1, at 278, 283 (Ex. 17); *see* ECF No. 1-1, at 37–38 ¶ 143 (Compl.).)

### B.    Procedural Background

On November 15, 2024, USM filed a Complaint against Nestle/Purina in the Circuit

Court of King William County, Virginia.  (ECF No. 1-1, at 7.)  On December 17, 2024,

Nestle/Purina timely removed USM's case to this Court properly invoking diversity jurisdiction

under 28 U.S.C. § 1332.[11]  (ECF No. 1, at 1–2.)

USM brings ten Counts in its Complaint—nine counts asserting breach of contract, and

one count asserting negligent misrepresentation.

| | |
|---|---|
| **Count I:** | **Breach of Contract for 2011 Overburden:** Nestle/Purina failed "to pay USM for overburden removed during 2011 in accordance with the 2010 Contract and the November 2022 Agreement." |
| **Count II:** | **Breach of Contract for 2012 Overburden:** Nestle/Purina failed "to pay USM for overburden removed during 2012 in accordance with the 2010 Contract and the November 2022 Agreement." |
| **Count III:** | **Breach of Contract for 2013 Overburden:** Nestle/Purina failed "to pay USM for overburden removed during 2013 in accordance with the 2010 Contract and the November 2022 Agreement." |
| **Count IV:** | **Breach of Contract for 2014 Overburden:** Nestle/Purina failed "to pay USM for overburden removed during 2014 in accordance with the 2010 Contract and the November 2022 Agreement." |
| **Count V:** | **Breach of Contract for 2015 Overburden:** Nestle/Purina failed "to pay USM for overburden |

---

[11] Section 1332 provides, in pertinent part: "The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different States."  28 U.S.C. § 1332(a).

removed during 2015 in accordance with the 2010
Contract and the November 2022 Agreement."

**Count VI:**         **Breach of Contract for 2016 Overburden:**
Nestle/Purina failed "to pay USM for overburden
removed during 2016 in accordance with the 2010
Contract and the November 2022 Agreement."

**Count VII:**        **Breach of Contract for 2018 Overburden:**
Nestle/Purina failed "to pay USM for overburden
removed during 2018 in accordance with the 2010
Contract and the November 2022 Agreement."

**Count VIII:**       **Breach of Contract for 2019 Overburden:**
Nestle/Purina failed "to pay USM for overburden
removed during 2019 in accordance with the 2010
Contract and the November 2022 Agreement."

**Count IX:**         **Negligent Misrepresentation:**  Nestle/Purina made
misrepresentations to USM "with a reckless disregard for
the truth."

**Count X:**          **Breach of Contract:**  Nestle/Purina failed to uphold its
obligation under the November 2022 Agreement "to
negotiate in good faith to mutually agree on a resolution
of the overburden compensation dispute."

(ECF No. 1-1, at 40–51 ¶¶ 152–203 (Compl.).)

Following removal, Nestle/Purina filed its Motion to Dismiss. (ECF No. 7.) USM

responded, (ECF No. 9 (under seal); ECF No. 17 (publicly available version of ECF No. 9 with

footnote two redacted)), and Nestle/Purina replied, (ECF No. 10).

For the reasons articulated below, the Court will grant the Motion.

## II.  Standard of Review

### A.    Rule 12(b)(6)

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint;

importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the

applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir.

1992) (citing 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356 (1990)). To survive Rule 12(b)(6) scrutiny, a complaint must contain sufficient factual information to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also* Fed. R. Civ. P. 8(a)(2) ("A pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief."). Mere labels and conclusions declaring that the plaintiff is entitled to relief are not enough. *Twombly*, 550 U.S. at 555. Thus, "naked assertions of wrongdoing necessitate some factual enhancement within the complaint to cross the line between possibility and plausibility of entitlement to relief." *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (quoting *Twombly*, 550 U.S. at 557) (internal quotation marks omitted).

A complaint achieves facial plausibility when the facts contained therein support a reasonable inference that the defendant is liable for the misconduct alleged. *Twombly*, 550 U.S. at 556; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This analysis is context-specific and requires "the reviewing court to draw on its judicial experience and common sense." *Giacomelli*, 588 F.3d at 193 (citation omitted). The court must assume all well-pleaded factual allegations to be true and determine whether, viewed in the light most favorable to the plaintiff, they "plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679; *see also Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cnty., Md.*, 684 F.3d 462, 467 (4th Cir. 2012) (concluding that the court in deciding a Rule 12(b)(6) motion to dismiss "'must accept as true all of the factual allegations contained in the complaint' and 'draw all reasonable inferences in favor of the plaintiff'" (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011))).

### III. Analysis

Nestle/Purina seeks relief on the following grounds:  (1) Counts I through VIII are barred by the applicable five-year statute of limitations to the extent they are based on the 2010 Contract;[12] (2) to the extent USM argues in its Opposition that it bases Claims I through VIII in part on a December 1, 2021 oral agreement, USM failed to pled this in its Complaint, (3) Counts I through VIII and Count X all rely on an "'agreement to agree' which is unenforceable under Virginia law"; (4) the November 2022 Agreement applies only "to contract years 2016 through 2019"; (5) Count IX, "negligent misrepresentation", is not actionable under Virginia law; and (6) even if the Court construes Count IX to be a claim for constructive fraud, it nonetheless fails to state a claim because, *inter alia*, USM fails "to allege a misrepresentation actionable in fraud." (ECF No. 16, at 1–2; ECF No. 10, at 1–2.)

Accepting USM's factual allegations as true and drawing all reasonable inferences in its favor, as the Court must at the motion to dismiss stage, USM fails to state any claim against Nestle/Purina.  The Court will grant the Motion to Dismiss without prejudice at this time.

---

[12] In its Opposition, USM clarifies that it does not base Counts I through VIII on the 2010 Contract, but rather on a purported December 1, 2021 oral agreement and the November 2022 Agreement.  (ECF No. 17, at 5, 9–10.)  USM argues that its claims are not time-barred because it "filed its Complaint on November 15, 2024, less than three [] years after USM and [Nestle/Purina] negotiated the December 1, 2021 oral agreement, certainly less than five [] years after they negotiated the November 28, 2022 Letter Agreement and less than one [] year after [Nestle/Purina] breached both agreements in January 2024."  (ECF No. 17, at 10.)

Nestle/Purina argues that to the extent USM's breach of contract claims are based on the 2010 Contract itself, they are time-barred.  "Plaintiff does not respond to this point and so concedes it." *Dyer v. Md. State Bd. of Educ.*, 187 F. Supp. 3d. 599, 619 (D. Md. 2016). *See also Marcotte v. Va. Beach City Pub. Sch.*, No. 2:17-cv-606 (MSD), 2018 WL 11509748, at *6 (E.D. Va. Aug. 24, 2018) ("[B]ecause Plaintiff has not responded to Defendants' argument, it is proper for this Court to treat such argument as conceded.")  The Court will dismiss USM's breach of contract claims to the extent they are based on the 2010 Contract.

**A.      USM Fails to State a Claim for Breach of Contract (Counts I Through VIII and Count X)**

USM fails to state a claim for the breach of contract claims at bar.  (Counts I through VIII and Count X).  First, to the extent USM bases Counts I through VIII on a purported December 1, 2021 oral agreement, these claims must be dismissed because USM fails to allege the formation or breach of an oral agreement in the Complaint itself.  *See S. Walk at Broadlands Homeowner's Ass'n v. Openband at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013) ("It is well-established that parties cannot amend their complaints through briefing or oral advocacy" to cure deficiencies with the complaint.)

Second, to the extent Counts I through V are based on the November 2022 Agreement, they fail to state a claim because the Agreement encompasses only USM's performance from 2016 through 2021, while these counts relate only to the years 2011 through 2015.

Third and finally, Count X, as well as Counts VI through VIII, to the extent they are predicated on the November 2022 Agreement, also fail to state a claim.  The November 2022 Agreement merely provides the promise that the parties will work to negotiate a resolution in good faith.  This constitutes an unenforceable "agreement to agree" under Virginia law.

To the extent USM attempts to rely in its Opposition on Nestle/Purina's purported "failure to provide documents" to support any of its breach of contract claims, (ECF No. 17, at 19), these claims still fail.  With respect to Counts VI through VIII, USM seeks damages for Nestle/Purina's failure "to pay USM for overburden removed during" the years 2016, 2018, and 2019.  (ECF No. 1-1, at 45 ¶ 178, 46 ¶ 183, 47 ¶ 188 (Compl.).)  Similarly, Count X seeks damages for Nestle/Purina's failure "to negotiate in good faith to mutually agree on a resolution of the overburden compensation dispute." (ECF No. 1-1, at 51 ¶ 200 (Compl.).)  As noted above, "[i]t is well-established that parties cannot amend their complaints through briefing or

16

oral advocacy" to cure deficiencies with the complaint. *S. Walk at Broadlands Homeowner's Ass'n*, 713 F.3d at 184.

For the reasons stated below, the Court will dismiss Counts I through VIII and Count X.

**1.    To the Extent Counts I through VIII are Based on the Unpled December 1, 2021 Oral Agreement, They Must be Dismissed Because USM May Not Amend Its Complaint Through Briefing**

In its Opposition, USM clarifies that it does not base Counts I through VIII on the 2010 Contract, but rather on the November 2022 Agreement and "the oral agreement made by [Vice President] Kerr on behalf of [Nestle/Purina] on December 1, 2021."[13]  (ECF No. 17, at 9.) Crucially, however, the Complaint explicitly predicates its breach of contract claims "under the terms of the 2010 Contract and the November 2022 Agreement." (ECF No. 1-1, at 40 ¶ 156, 41 ¶ 161, 42 ¶ 166, 43 ¶ 171, 44 ¶ 176, 45 ¶ 181, 46 ¶ 186, 47 ¶ 191 (Compl.).)  USM provides no allegations in the Complaint that support the reasonable inference that the parties formed a contract through an oral agreement that consisted of an offer and acceptance that was supported by valid consideration.  Rather, the Complaint provides that on December 1, 2021, during a meeting between USM and Nestle/Purina, Ms. Kerr, a Nestle/Purina Vice President, stated: "If we owe you, we will pay you." (ECF No. 1-1, at 23 ¶ 79 (Compl.).)

"It is well-established that parties cannot amend their complaints through briefing or oral advocacy" to cure deficiencies with the complaint. *S. Walk at Broadlands Homeowner's Ass'n*, 713 F.3d at 184; *Beckford v. Elevance Health, Inc.*, No. 3:23-cv-828 (MHL), 2024 WL 3974241, at *6–7 (E.D. Va. Aug. 28, 2024) (rejecting represented plaintiff's attempt to improperly amend

---

[13]  To repeat, by failing to respond to Nestle/Purina's argument that to the extent USM's breach of contract claims are based on the 2010 Contract itself, they are time-barred, USM concedes argument. *See Dyer* 187 F. Supp. 3d. at 619; *Marcotte*, 2018 WL 11509748, at *6.  The Court will dismiss USM's breach of contract claims to the extent they are based on the 2010 Contract.

her complaint via briefing and refusing to consider claim of constructive discharge that was not pled.) To the extent Counts I through VIII are based on an unpled oral contract, they will be dismissed.

The Court now turns to the remaining bases for Counts I through VIII, and the sole basis for Count X, the November 2022 Agreement.

> **2.      To the Extent Counts I through V Are Based on the November 2022 Agreement, They Fail to State a Claim Because the Agreement Encompasses USM's Performance Only From 2016 through 2021**

The November 2022 Agreement addresses the dispute regarding USM's removal of overburden only from 2016 through 2021. (ECF No. 1-1, at 239 (Ex. 11).) It provides, in pertinent part:

> The parties agree that should the Data indicate any discrepancy that would justify an increase or decrease in the amount owed to USM for overburden removal during any calendar year [between 2016 and 2021] they shall negotiate in good faith to mutually agree on a resolution.

(ECF No. 1-1, at 239 ¶ 1 (Ex. 11).)

Counts I through V relate to USM's payment for overburden removed in 2011 through 2015. (ECF No. 1-1, at 40–44 ¶¶ 152-76 (Compl.).) As a result, the November 2022 Agreement does not apply to Counts I through V.

USM disagrees, arguing that the November 2022 Agreement is "equally applicable to all prior years covered by the 2010 Contract." (ECF No. 17, at 10–11.) USM contends that Nestle/Purina must have intended the November 2022 Agreement to cover these years because Vice President Kerr stated "[i]f we owe you, we will pay you" when USM informed Nestle/Purina of its belief that it was underpaid throughout the entire course of their contractual relationship. (ECF No. 17, at 8–10; ECF No. 1-1, at 23 ¶ 79 (Compl.).) Therefore, when Nestle/Purina agreed to remove the statute of limitations provision from the November 2022

18

Agreement, USM argues, Nestle/Purina had implicitly "agreed with USM's provision:  that [Vice President Kerr's] promise, on behalf of [Nestle/Purina], had been that USM would be paid for all overburden removed for which it had not been paid, and not merely for any overburden for which it had not been paid that was still subject to a claim that was not time-barred."  (ECF No. 17, at 12.)

Under Virginia law, "[w]hen a contract is clear and unambiguous, it is the court's duty to interpret the contract, as written." *Palmer & Palmer Co., LLC v. Waterfront Marine Const., Inc.*, 276 Va. 285, 289 (2008). When there is no ambiguity on the face of a contract, courts must consider only the plain meaning of the written terms of the contract. *See 24th Senatorial Dist. Republican Comm. v. Alcorn*, 820 F.3d 624, 631 (4th Cir. 2016); *see also Centennial Broad., LLC v. Burns*, 254 F. App'x 977, 982 (4th Cir. 2007) (stating that "[p]arol evidence cannot be used to first create an ambiguity and then remove it", rather, ambiguity must appear "on the face of the instrument" for parol evidence to be applicable) (*quoting Cohan v. Thurston*, 292 S.E.2d 45, 46 (Va. 1982)).

Here, the November 2022 Agreement unambiguously applies to the years 2016 through 2021. The Court rejects USM's attempt to use parol evidence of Vice President Kerr's statements regarding what Nestle/Purina may owe in order to manufacture ambiguity into the November 2022 Agreement that does not exist on the face of the contract. *See Centennial Broad.*, 254 F. App'x at 982.  Because the November 2022 Agreement addresses the dispute regarding USM's removal of overburden only from 2016 through 2021, it has no application to the years 2011 through 2015.  In sum, Counts I through V address only the years 2011 through 2015, so the Court must dismiss Counts I through V to the extent they are predicated on the November 2022 Agreement.

The Court now turns to Counts VI through VIII to the extent they are predicated on the November 2022 Agreement, and to Count X, which is wholly predicated on the November 2022 Agreement.

### 3.    Count X, as Well as Counts VI through VIII to the Extent They Are Predicated on the November 2022 Agreement, Fail to State a Claim

Count X, as well as Counts VI through VIII—to the extent they are predicated on the November 2022 Agreement—fail to state a claim because they all rely on the provision that "should the Data indicate any discrepancy that would justify an increase or decrease in the amount owed to USM for overburden removal [between 2016 and 2021] [the parties] shall negotiate in good faith to mutually agree on a resolution." (ECF No. 1-1, at 239 (Ex. 11); ECF No. 1-1, at 29 ¶ 96 (Compl.).)  This provision constitutes an unenforceable "agreement to agree." *See Meridian Invs., Inc. v. Fed. Home Loan Mortg. Corp.*, 855 F.3d 573, 580 (4th Cir. 2017) (an agreement between the parties to negotiate in good faith toward a final contract is unenforceable).

USM asserts that other than this "agreement to agree," the parties' agreement also obligated Nestle/Purina "to provide documents." (ECF No. 17, at 19.)  USM argues that the Complaint states a cause of action for breach of contract because Nestle/Purina purportedly "fail[ed] to provide [these] documents," thereby breaching the contract. (ECF No. 17, at 19.)  But Nestle/Purina's purported "failure to provide documents", (ECF No. 17, at 19), cannot support the breach of contract claims in Counts VI through VIII or X.  As discussed below, Counts VI through VIII and Count X do not raise the failure to provide documents as the basis for the alleged breaches of contract.

### a. Legal Standard: Agreements to Negotiate in Good Faith

To serve as the basis for a breach of contract claim, an agreement must demonstrate the "mutual assent of the contracting parties to terms reasonably certain under the circumstances." *Allen v. Aetna Cas. and Sur. Co.*, 281 S.E.2d 818, 820 (Va. 1981). Likewise, an "agreement to agree," or an agreement between parties to form another agreement at some point in the future, is unenforceable under Virginia law. *Meridian Invs.*, 855 F.3d at 580; *see also W.J. Schafer Assocs. v. Cordant, Inc.*, 493 S.E.2d 512, 515 (Va. 1997).

Agreements to "negotiate in good faith [are] not sufficiently concrete to give rise to an obligation" unless the good faith provision contains "more definite obligations" that demonstrates the mutual assent of the parties to render the contract as enforceable. *Meridian Invs.*, 855 F.3d at 580; *see Beazer Homes Corp. v. VMIF/Anden Southbridge Venture*, 235 F. Supp. 2d 485, 490–91 (E.D. Va. 2002) (an agreement to "negotiate in good faith to reach a mutually acceptable Contract based on the terms and conditions outlined herein" was impermissibly vague to bind the parties). An obligation is not sufficiently concrete when the provision is "too vague and indefinite to be enforced" on the contracting parties, particularly for contracts "to negotiate in good faith toward a final contract." *W.J. Schafer Assocs.*, 493 S.E.2d at 515; *Meridian Invs.*, 855 F.3d at 580.

### b. USM Fails to Base a Breach of the November 2022 Agreement Beyond an Impermissible Agreement to Agree

USM and Nestle/Purina negotiated and signed the November 2022 Agreement to define the scope of the parties' investigations into the true amount of overburden removed between the last four calendar years of the 2010 Contract. (ECF No. 1-1, at 239 (Ex. 11); *see* ECF No. 1-1, at 25–27 ¶¶ 84–86, 95 (Compl.).) The 2022 Agreement states, in pertinent part:

> The parties agree that should the Data indicate any discrepancy that would justify an increase or decrease in the amount owed to USM for overburden removal during any calendar year [between 2016 and 2021] they shall negotiate in good faith to mutually agree on a resolution[.]

(ECF No. 1-1, at 239 ¶ 1 (Ex. 11).)

The November 2022 Agreement amounts to the same sort of unenforceable preliminary agreement at issue in *Beazer*, in which the negotiations between a property owner and a real estate developer to purchase a plot of land failed despite the parties signing an agreement for them to "negotiate in good faith to [r]each a mutually acceptable [c]ontract." 235 F. Supp. 2d at 487–88 (first brackets in original). The real estate developer brought a breach of contract claim, arguing that the property owner failed to negotiate in good faith. *Id.* at 488, 490. The *Beazer* Court concluded that the parties' agreement to negotiate was "merely an unenforceable agreement to agree." *Id.* at 491. Indeed, here as in *Beazer*, "[i]t is fundamental to contract law that mere participation in negotiations does not create a binding obligation, even if agreement is reached on all terms. More is needed than agreement on each detail—the parties must have intended to enter into a binding agreement." *Id.* at 492 (quoting *Burbach Broadcasting Co. of Delaware v. Elkins Radio Corp.*, 278 F.3d 401, 406 (4th Cir. 2002).

The November 2022 Agreement provides that the parties will "negotiate in good faith to mutually agree on a resolution" if any disparities are found within the DAA data. (ECF No. 1-1, at 239 (Ex. 11).) First, this provision does not constitute an agreement that there *are* disparities in DAA data. Even taking as true Vice President Kerr's statements, she provided a conditional promise at best: "*if we owe you,* we will pay you."

Second, as in *Beazer*, the future negotiation provision simply shows a mutual commitment for the parties to negotiate in good faith for a future contract to resolve any potential payment disparities, not a mutual commitment for Nestle/Purina to definitively pay USM after

22

discovering any disparity. *See Beazer Homes Corp.*, 235 F. Supp. 2d at 490–91. The parties

here did not remotely agree "on all terms." Certainly, there is "no mutual assent of the

contracting parties to terms reasonably certain in the circumstances [to] have an enforceable

contract." *Allen v. Aetna Cas. and Sur. Co.*, 281 S.E.2d 818, 820 (Va. 1981) (noting that the lack

of a specific sum or method to determine payment is too indefinite to create a contract).

     In its Opposition, USM contends that both the "good faith" provision and Nestle/Purina's

agreement to provide USM with a limited subset of the DAA data,[14] imposed "two obligations

upon [Nestle/Purina]: to provide documents and to negotiate in good faith." (ECF No. 17, at 19.)

First, as just discussed, the parties' promise to "negotiate in good faith" cannot serve as the basis

of a breach of contract claim under Virginia law. *See Beazer Homes Corp.*, 235 F. Supp. 2d at

490.

     Third, Nestle/Purina's purported "failure to provide documents" relied upon by USM,

(ECF No. 17, at 19), cannot support the breach of contract claims in Counts VI through VIII or

X. With respect to Counts VI through VIII, USM seeks damages for Nestle/Purina's failure "to

pay USM for overburden removed during" the years 2016, 2018, and 2019, rather than for failure

to provide documents. (ECF No. 1-1, at 45 ¶ 178, 46 ¶ 183, 47 ¶ 188 (Compl.).) Similarly,

Count X seeks damages for Nestle/Purina's failure "to negotiate in good faith to mutually agree

---

[14] The November 2022 Agreement provides:

> [Nestle/Purina] or its agent will provide the data . . . (together with any other
> materials related thereto that are provided to USM, the "Data") to USM and KBJW;
> as indicated on Exhibit A, the Data will pertain to the period from 2016 through
> 2021 (the "Recent Period"). The parties agree that should the Data indicate any
> discrepancy that would justify an increase or decrease in the amount owed to USM
> for overburden removal during any calendar year within the Recent Period they
> shall negotiate in good faith to mutually agree on a resolution[.]

(ECF No. 1-1 239 ¶ 1 (Ex. 11).)

on a resolution of the overburden compensation dispute." (ECF No. 1-1, at 51 ¶ 200 (Compl.).)
It does not raise the failure to provide documents as the basis for the breach of contract.  "It is
well-established that parties cannot amend their complaints through briefing." *See S. Walk at
Broadlands Homeowner's Ass'n, Inc.*, 713 F.3d at 184.

### 4.    The Court Will Dismiss All of USM's Breach of Contract Claims (Counts I through VIII and Count X)

In summary, in its Opposition, USM disclaims reliance on the 2010 Contract for Counts I
through VIII and clarifies that it bases these counts on a purported December 1, 2021 oral
agreement and the November 2022 Agreement.  (ECF No. 17, at 5, 9–10.)  Because USM failed
to respond to Nestle/Purina's argument that—to the extent USM's breach of contract claims are
based on the 2010 Contract itself—they are time-barred, it concedes the argument. *See Dyer v.
Md. State Bd. of Educ.*, 187 F. Supp. 3d 599, 619 (D. Md. 2016); *Marcotte v. Va. Beach City
Pub. Sch.*, No. 2:17-cv-606 (MSD), 2018 WL 11509748, at *6 (E.D. Va. Aug. 24, 2018).  The
Court will dismiss USM's breach of contract claims to the extent they are based on the 2010
Contract.

For the reasons articulated above, USM fails to plead the existence of an enforceable oral
contract, and the November 2022 Agreement fails to support any of USM's breach of contract
claims.  As a result, the Court will dismiss Counts I through VIII and Count X in their entirety.[15]

---

[15] Under Virginia law, the statute of limitations for a breach of contract is five years
starting at the date of the alleged breach. Va. Code § 8.01-246(2).

As identified above, USM argues that its claims are not time-barred because it filed its
November 15, 2024 Complaint fewer than three years after the purported December 1, 2021 oral
agreement and less than five years after the November 2022 Agreement, and less than one year
after Nestle/Purina purportedly "breached both agreements in January 2024." (ECF No. 17, at
10.) USM further argues that Nestle/Purina "is equitably estopped from pleading the statute of
limitations, at least as to sums that might be due for 2016, 2018[,] and 2019", arguing that by

24

The Court now turns to USM's final claim, Count IX's claim for negligent

misrepresentation.

### B.    USM Fails to State a Claim for Negligent Misrepresentation or Constructive Fraud (Count IX)

USM brings Count IX of the Complaint against Nestle/Purina for making five separate

statements over two years that were: (1) "not true"; (2) made "with a reckless disregard of the

truth"; (3) made with the intent that USM would rely on such statements; and (4) relied upon by

USM, resulting it in harm.  (ECF No. 1-1, at 49–50 ¶¶ 193–98 (Compl.).)  USM fails to state a

claim under any applicable legal theory available under Virginia law.  First, negligent

misrepresentation is not an independent cause of action under Virginia law.  Second, even

construing Count IX to be a claim for constructive fraud, and even after concluding that this

claim is not time-barred, it nonetheless fails to state a claim because USM fails to identify any

misrepresentation beyond unfulfilled promises to perform future acts.

#### 1.    The Court Will Construe Count IX as a Claim for Constructive Fraud

As a threshold matter, Virginia law does not recognize negligent misrepresentation as a

cause of action apart from constructive fraud.  *Barry v. Novartis Pharm. Corp.*, No. 3:22-cv-196

(DJN), 2022 WL 2373452, at *3 (E.D. Va. June 30, 2022); *Baker v. Elam*, 883 F. Supp. 2d 576,

581 (E.D. Va. 2012).  In their briefing, both parties appropriately construe Count IX as a

constructive fraud claim.  (ECF No. 16, at 2; ECF No. 17, at 20.)   Notably, the term

---

"December 1, 2021, the statute of limitations had not run for any of those time periods."  (ECF No. 17, at 17.)

The Court does not rely on the statute of limitations in concluding that none of USM's breach of contract claims survive to the extent they are based on the December 2021 oral contract or the November 2022 Agreement, (nor could it, where the Complaint was filed in 2024 and the relevant statute of limitations is five years).  As a result, this Court need not, and does not, address the merits of USM's equitable estoppel argument.

"constructive fraud" does not appear anywhere in the Complaint. (*See generally*, ECF No. 1-1.) But because USM requests leave to amend and its opposition, (*see* ECF No. 17, at 24), and the parties brief as such in any event, the Court will read Count IX to bring a constructive fraud claim. *See William v. AES Corp.*, 28 F. Supp. 3d 553, 573 (E.D. Va. 2014) (explaining that because Virginia law does not recognize negligent misrepresentation as a separate cause of action from constructive fraud, the court would construe Count IX, a claim for negligent misrepresentation, as a claim for constructive fraud); *see Barry*, 2022 WL 2373452, at *3 ("Virginia law does not recognize negligent [misrepresentation] as a cause of action separate and apart from constructive fraud. . . . The Court, therefore, construes Plaintiff's negligent misrepresentation claim as a constructive fraud claim.").

For the reasons discussed below, even construing Count IX to bring a constructive fraud claim and presuming that it is not barred by the statute of limitations, (despite Nestle/Purina's argument to the contrary), it would fail on the merits because a constructive fraud claim cannot be predicated on unfulfilled promises to perform future acts.

The Court will dismiss Count IX.

### a. Legal Standard: Statute of Limitations for Constructive Fraud

Under Virginia law, the statute of limitations for constructive fraud claims is two years. Va. Code Ann. § 8.01-243(A). This two-year period begins when the alleged fraud "is discovered or by the exercise of due diligence reasonably should have been discovered." *Id.* § 8.01–249. Due diligence is defined as "such a measure of prudence . . . ordinarily exercised by a reasonable and prudent [person] under the circumstances." *Dunlap v. Tex. Guaranteed*, 590 F. App'x 244, 244 (4th Cir. 2015) (quoting *Schmidt v. Household Fin. Corp., II*, 661 S.E.2d 834, 839 (Va. 2008)). The plaintiff bears the burden of plausibly alleging that despite the plaintiff's

due diligence, the alleged fraud could not be discovered within the two-year statutory window.

*Schmidt*, 661 S.E.2d at 839–40.

> **b. USM's Constructive Fraud Claim Is Not Barred by the Statute of Limitations Because USM Exercised Due Diligence in <u>Investigating the Alleged Fraud</u>**

Both parties proffer different dates for when the statute of limitations began to accrue for USM's constructive fraud claim. USM argues that the statute of limitations began running in January 2024, when Nestle/Purina refused to continue with the negotiations, thereby providing USM with "actual notice—*i.e.* [when USM] reasonably should have . . . discovered—that [Nestle/Purina] did not intend to live up to what it had clearly promised." (ECF No. 17, at 21–22 (internal quotation marks omitted); *see* ECF No. 1-1, at 37-38 ¶¶ 141–43 (Compl.).)

Nestle/Purina counters that the statute of limitations for USM's constructive fraud claim began to accrue no later than December 29, 2021—over two years before USM filed its Complaint—when USM sent a letter accusing Nestle/Purina of "stonewalling" to prevent the release of the DAA data and that it demonstrated "an obvious desire on the part of [Nestle/Purina] to not allow a true reconciliation the past aerial surveys." (ECF No. 10, at 8 (brackets in original) (quoting ECF No. 1-1, at 23–25 ¶ 82 (Compl.)).) Nestle/Purina further contends that, assuming that it was engaging in constructive fraud, its refusal should have made USM "suspect that something was amiss" with Nestle/Purina's behavior and would therefore put a reasonable and prudent person on notice of the alleged fraud. (ECF No. 10, at 8.)

In support of its position, Nestle/Purina points to *Schmidt v. Household Finance Corp., II*, a case involving a plaintiff executing a mortgage loan application that had an interest rate higher than what was represented to him by the loan company's agents along with other fundamental, uncommunicated deficiencies to the loan. 661 S.E.2d at 836–37. The plaintiff argued that the

statute of limitations for his fraud claim began when he first received actual notice of the loan company's alleged fraudulent activities when he tried to refinance the mortgage. *See id.* at 839. The Supreme Court of Virginia disagreed, stating that "a reasonable and prudent person would suspect that something was amiss" due to the fact that the loan company agents wanted the plaintiff to sign the loan documents in a restaurant, the loan was not signed by a notary public as is typically required, and the plaintiff never received a copy of the loan as promised. *Id.* at 839–40. Therefore, the *Schmidt* court held that the claim was time-barred because the time when the plaintiff should have felt that "something was amiss" was more than two years before he filed suit. *Id.* at 840–41.

*Schmidt* is distinguishable from the case at bar. There, although the plaintiff should have reasonably expected "that something was amiss with regard to the mortgage loan," he "apparently made no follow-up inquiries" about these suspicions. *Id.* at 840. In contrast, USM consistently communicated with Nestle/Purina when the latter failed to immediately comply with its oral or written promises to share the DAA data starting in December 2021. (*See* ECF No. 1-1, at 23–25 ¶¶ 81–85 (Compl.).) Despite Nestle/Purina's previous assurances to the contrary, on December 15, 2021, Mr. Parrish "categorically refused" to provide USM with the DAA data. (ECF No. 1-1, at 23 ¶ 81 (Compl.).) While USM's December 29, 2021 letter in response did accuse Nestle/Purina of having an "obvious desire on the part of [Nestle/Purina] to not allow a true reconciliation of the past aerial surveys," that same letter included a request by USM for the parties to engage a third-party mediator to continue their negotiations over the issue. (ECF No. 1-1, at 204 (Ex. 6).) Approximately ten weeks later, Nestle/Purina accepted USM's request to continue the parties' negotiations by sending a meeting request. (*See* ECF No. 1-1, at 23–25 ¶¶ 82–85 (Compl.).)

28

Viewing USM's well-plead allegations in the light most favorable to it, USM acted with due diligence. Despite its efforts, however, USM did not discover, and could not have discovered, any of the alleged fraud until Nestle/Purina stated in its January 30, 2024 letter that "each party is firm in its stance regarding the overburden calculations and disagrees with the other's position," essentially ending the parties' negotiations. (ECF No. 1-17, at 1.) Because a reasonable and prudent person using due diligence could not have found any of the alleged fraud until January 2024, the statute of limitations does not bar USM's constructive fraud claim.

The Court will now turn to the merits of the constructive fraud claim.

### c.  Legal Standard: Constructive Fraud

For allegations of fraud or mistake, a plaintiff bears the heightened burden to "state with particularly the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); *see, e.g., Corder v. Antero Res. Corp.*, 57 F.4th 384, 401 (4th Cir. 2023).

A constructive fraud claim requires "clear and convincing evidence" that (1) a false representation of a material fact; (2) was made innocently or negligently; and (3) the injured party was damaged as a result of his or her reliance upon the misrepresentation. *Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017) (quoting *Mortarino v. Consultant Eng'g Servs., Inc.*, 467 S.E.2d 778, 782 (Va. 1996)). "[A] plaintiff must also show by 'clear and convincing evidence that one has represented as true what is really false, in such a way as to induce a reasonable person to believe it, with the intent that the person will act upon this representation.'" *Id.* (quoting *Mortarino*, 467 S.E.2d at 782).)

Like claims of actual fraud, a plaintiff alleging constructive fraud must further show that the alleged misrepresentation "relate[s] to a present or a pre-existing fact." *Soble v. Herman*, 9 S.E.2d 459, 500 (Va. 1940); *see Poth v. Russey*, 99 F. App'x 446, 452–53 (4th Cir. 2004)

29

(applying this "general rule" of fraud specifically to constructive fraud). Fraud claims cannot be based on statements about future events or unfulfilled promises.[16] *See Lissmann v. Hartford Fire Ins. Co.*, 848 F.2d 50, 53 (4th Cir. 1988) ("[a] promise to perform an act in the future is not, in a legal sense, a representation as that term is used in the fraud context" because otherwise, "almost every breach of contract could be claimed to be a fraud.") (citing *Soble*, 9 S.E.2d at 459); *see also Cyberlock Consulting, Inc. v. Info. Experts, Inc.*, 876 F. Supp. 2d 672, 681 (E.D. Va. 2012); *Richmond Metro. Auth. v. McDevitt St. Bovis, Inc.*, 507 S.E.2d 344, 347 (1998) (where "allegations of constructive fraud are nothing more than allegations of negligent performance of contractual duties", they are "not actionable in tort.")

### d. USM Fails to State a Claim for Constructive Fraud Because It Fails to Identify Misrepresentations Beyond Unfulfilled Promises

USM fails to state a claim for constructive fraud because it fails to identify alleged misrepresentations beyond Nestle/Purina's purportedly unfulfilled promises regarding future acts.

USM identifies five alleged misrepresentations from Nestle/Purina during and after the parties' negotiations surrounding the November 2022 Agreement, four of which were oral promises from Nestle/Purina representatives or contractors to USM. (ECF No. 1-1, at 49 ¶ 193 (Compl.).) The alleged oral misrepresentations revolve around three separate communications from Nestle/Purina representatives to USM, including: (1) from Mr. Parrish stating that "if USM

---

[16] "[A]n exception exists where a defendant makes a promise that, when made, [they] have not intention of performing, in which case 'th[e] promised is considered a misrepresentation of present fact and may form the basis for a claim of actual fraud.'" *Cyberlock Consulting, Inc. v. Information Experts, Inc.*, 876 F.Supp.2d 672, 681 (E.D. Va. 2012). Appropriately, neither party addresses any count before the Court as an actual fraud claim.

were to demonstrate that it had not been fully paid for its past overburden removal, then [Nestle/Purina] would pay USM what it was owed" and that USM would receive the DAA data; (2) from Ms. Kerr that "if USM were to demonstrate that it had not been fully paid for its past overburden removal, then [Nestle/Purina] would pay USM what it was owed"; and (3) from Timmons emphasizing Nestle/Purina's desire to reach a mutual resolution over the overburden dispute.  (ECF No. 1-1, at 49 ¶ 193 (Compl.).)  The fifth misrepresentation cites to the November 2022 Agreement itself, with the position that it "specifically obligated [Nestle/Purina] to negotiate in good faith to mutually agree on a resolution."  (ECF No. 1-1, at 49 ¶ 193 (Compl.).)

Unfulfilled promises to perform an act in the future, however, cannot give rise to a constructive fraud claim.  *See Lissman*, 848 F.2d at 53 ("A promise to perform an act in the future is not, in a legal sense, a representation as that term is used in the fraud context" because otherwise, "almost every breach of contract could be claimed to be a fraud.") (citing *Soble*, 9 S.E.2d at 459).

The Court will dismiss Count IX.

### IV. USM Will be Permitted to File a Motion Seeking Leave to Amend

In its Opposition, USM broadly requests that the Court grant it "leave to amend any cause of action that this Court may find defective."  (ECF No. 17, at 24.)  In its Reply, Nestle/Purina opposes this request on the narrow basis that granting "leave to amend to plead the purported oral agreement . . . would be futile."  (ECF No. 10, at 2.)

Federal Rule of Civil Procedure 15(a)(2) provides that courts "should freely give leave" to parties to amend pleadings "when justice so requires."  Fed. R. Civ. P. 15(a)(2).  However, a "district court may deny leave to amend for reasons 'such as . . . undue prejudice to the opposing party by virtue of the allowance of the amendment, [or] futility of amendment[.]'"  *Glaser v.*

*Enzo Biochem, Inc.*, 464 F.3d 474, 480 (4th Cir. 2006) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)). "Futility is apparent if the proposed amended complaint fails to state a claim under the applicable rules and accompanying standards." *Katyle v. Penn Nat.l Gaming, Inc.*, 637 F.3d 462, 471 (4th Cir. 2011).

To date, USM has not filed a motion for leave to amend, nor has it presented the Court with a proposed Amended Complaint. Nor has Nestle/Purina presented the Court will a full discussion of the futility of any amendment. The Court concludes that allowing USM to file a motion seeking leave to amend serves the interest of justice and will not cause Nestle/Purina undue prejudice.

## V. Conclusion

For the reasons articulated above, the Court will grant the Motion without prejudice.

(ECF No. 7.)

An appropriate Order shall issue.

Date: 09/15/25
Richmond, Virginia

_____ /s/
M. Hannah Lauck
United States District Judge

33