**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

**U.S. MINING, INC.,**

**Plaintiff,**

**v.** **Civil Action No. 3:24cv894**

**NESTLE PURINA PETCARE CO.,**

**Defendant.**

# MEMORANDUM OPINION

This matter comes before the Court on Plaintiff U.S. Mining, Inc.'s ("USM") Motion for Leave to File an Amended Complaint (the "Motion").[1] (ECF No. 20.) USM attached a copy of its Proposed Amended Complaint (the "Amended Complaint"), (ECF No. 20-1), and copies of its proposed exhibits for the Amended Complaint, (ECF Nos. 20-2–20-19), to the Motion. Defendant Nestle Purina Petcare Co. ("Nestle/Purina" or "N/P") responded in opposition to the Motion, (ECF No. 26), and USM replied, (ECF No. 27).

The matter is ripe for disposition. The Court dispenses with oral argument because the materials before it adequately present the facts and legal contentions, and argument would not aid in the decisional process.

For the reasons articulated below, the Court will deny USM's Motion with prejudice as to its Counts I through XXIV of the Amended Complaint and grant the Motion as to Count XXV of the Amended Complaint. (ECF No. 20.)

---

[1] The Court employs the pagination assigned by the CM/ECF docketing system.

## I. Factual and Procedural Background

### A. Factual Allegations[2]

#### 1. On January 1, 2010, USM Begins Performing Mining Services for Nestle/Purina

In October 2009, USM[3] and Nestle/Purina entered into a Service Agreement (the "2010 Contract"). (ECF No. 20-3, at 6.) Pursuant to the 2010 Contract, USM agreed to provide mining services at Nestle/Purina's mine in King William, Virginia, beginning January 1, 2010, through January 31, 2020. (ECF No. 20-1 ¶¶ 6, 9.) Later, the parties entered a second contract that took effect on February 1, 2020 (the "2020 Contract"), extending USM's contractual relationship with Nestle/Purina through December 31, 2025. (ECF No. 20-1 ¶¶ 7, 8; ECF No. 20-4, at 4.)

On January 1, 2010, "USM began providing mining services for [Nestle/Purina]." (ECF No. 20-1 ¶ 6.) Among the several contractual responsibilities outlined in the 2010 Contract, this lawsuit stems from USM's mining of montmorillonite clay—a material used by Nestle/Purina to manufacture cat litter—and the removal of topsoil and other matter (known as "overburden") to

[2] As discussed below, Nestle/Purina asserts that the Court should deny USM's Motion under Federal Rule of Civil Procedure 15(a)(2) because amendment of his complaint would be futile. In determining whether amendment of the complaint would be futile, the Court must determine if the "proposed amendment . . . is clearly insufficient or frivolous on its face . . . [or] if the claim it presents would not survive a motion to dismiss." *Save Our Sound OBX, Inc. v. N.C. Dep't of Transp.*, 914 F.3d 213, 228 (4th Cir. 2019) (quotation omitted).

Applying the motion to dismiss standard to the proposed Amended Complaint, the Court will assume the well-pleaded factual allegations in the proposed Amended Complaint to be true and will view them in the light most favorable to USM. *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993); *see also Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992).

[3] The original parties to the 2010 Contract were Nestle/Purina and Cross-Land Harbour, Inc., a Virginia corporation that dissolved following its merger with USM. (ECF No. 20-1 ¶¶ 3–6.); ECF No. 20-3, at 3.) USM's cause of action arose after USM and Cross-Land Harbour, Inc. (collectively, "USM"), began providing mining services to Nestle/Purina during the contractual period. (ECF No. 20-1 ¶ 5.)

uncover and extract the montmorillonite clay. (ECF No. 20-1 ¶¶ 10–12.) Pursuant to the 2010 Contract, USM billed Nestle/Purina on a biweekly basis for the quantity of overburden it removed during its efforts to extract montmorillonite clay. (ECF No. 20-1 ¶¶ 22, 32.) Nestle/Purina consistently paid these invoices. (ECF No. 20-1 ¶ 31.)

"In 2011, USM employed a third-party contractor to move overburden." (ECF No. 20-1 ¶ 37.) "The third-party contractor determined the quantity of overburden removed by use of a ground-based GPS system." (ECF No. 20-1 ¶ 38.) USM then billed Nestle/Purina based on these measurements. (ECF No. 20-1 ¶ 38.)

### 2. In 2012, Nestle/Purina Hires a Third-Party Consultant to Calculate the Amount of Overburden USM Removed and the Parties Begin Employing a Payment Reconciliation Process

In 2012, Nestle/Purina hired its own third-party consultant, Draper Aden Associates ("DAA"), to use "photogrammetry" survey data ("the DAA data") to "determine the amount of total overburden" that USM removed during 2011. (ECF No. 20-1 ¶ 39.) DAA's survey of the overburden removed in 2011 indicated that USM had removed 36,013 cubic yards of overburden less than its initial invoices indicated, totaling $91,008.51 in overpayments by Nestle/Purina in 2011, which USM returned. (ECF No. 20-1 ¶¶ 40–41.)

Following this discrepancy in 2011 measurements, the parties agreed to set the biweekly interim payment invoices by measuring the removed overburden "per bank cubic yard"[4] as

[4] After 2011, USM calculated the amount of overburden removed by multiplying (1) "the number of truckloads of overburden removed" by (2) "a cubic yards per truckload figure determined in a manner prescribed by" Jim Job, a Nestle/Purina employee. (ECF No. 20-1 ¶ 34.)

To calculate the number of cubic yards per truckload, the parties used a formula referred to by USM as the "[Jim] Job Formula." (ECF No. 20-1 ¶ 35.) The Job Formula involved dividing "the total cubic yards of overburden removed during the prior year, as determined by [Nestle/Purina's] consultant (DAA), by the number of truckloads hauled that year." (ECF No. 20-1 ¶ 35.)

determined by DAA's annual survey provided to USM by Nestle/Purina. (ECF No. 20-1 ¶¶ 23, 34, 42–43.) At the end of each year, DAA would provide photogrammetry survey data for Nestle/Purina to calculate the precise amount of overburden that it believed was removed in the preceding year. (ECF No. 20-1 ¶ 43.) "If the amount calculated by [Nestle/Purina] was different than the amount that had been billed by USM, the two companies would go through a reconciliation process to determine whether money was owed by [Nestle/Purina] to USM or by USM to [Nestle/Purina]." (ECF No. 20-1 ¶ 43.) This payment structure persisted for the remainder of the 2010 Contract. (ECF No. 20-1 ¶¶ 42–43.)

### 3. <u>USM Becomes Increasingly Skeptical of the DAA Data</u>

Following the adoption of the "per bank cubic yard" pay structure for interim payments, USM "immediately" had concerns with how DAA was collecting its data for the annual survey the resulted in the biweekly invoices. (ECF No. 20-1 ¶¶ 44–49.) Over time, DAA's data "resulted in varying truckload quantities each year, always lower than the fully loaded capacity of USM's trucks." (ECF No. 20-1 ¶ 47.) According to USM, however, USM did not vary the amount of overburden it removed annually. (*See* ECF No. 20-1 ¶ 47.) Throughout the duration of the 2010 Contract and 2020 Contract, USM retained the same employees, used the same haul trucks, and provided clear directives "that each truck be fully loaded" with overburden. (ECF No. 20-1 ¶ 47.)

Because the DAA data did not accurately capture the amount of overburden USM removed annually, USM concluded that the DAA data, and therefore Nestle/Purina's data, was wrong. (ECF No. 20-1 ¶ 47.) However, USM continued to accept the DAA data when calculating Nestle/Purina's biweekly invoices despite its "belief that it was not receiving full payment for overburden removed." (ECF No. 20-1 ¶ 48.)

### 4. In 2020, USM Begins to Investigate the DAA Data

In early 2020, USM hired Rish Equipment ("Rish") "to conduct an independent survey to determine the actual quantity of overburden moved" for the calendar years 2016, 2018, and 2019 (the "2021 Study").[5] (ECF No. 20-1 ¶ 50.) According to the 2021 Study, Rish "indicated that the real quantity of each truckload was significantly greater than what had been historically determined by" the DAA data, including during the "prior years covered by the 2010 Contract." (ECF No. 20-1 ¶ 51.)

In 2021, DAA changed its overburden measurement system which produced results showing that USM removed a much greater amount of overburden than in previous years. The new calculations were more "in line with what USM believed to be the true quantity of overburden it was moving in each truckload." (ECF No. 20-1 ¶¶ 53–57.) Following these new calculations, USM began to vocalize its "longstanding belief that [Nestle/Purina] or [DAA] . . . made computational errors when calculating the cubic yardage of overburden removed each year that consistently resulted in an understatement of quantity removed" and $1,214,612.10 in underpayments by Nestle/Purina during the three-year 2021 Study testing period—2016, 2018, and 2019.[6] (ECF No. 20-1 ¶¶ 59–60.)

---

[5] The 2021 Study (and all future reviews of overburden removal data) does not provide data for the 2017 calendar year because USM did not remove any overburden during that period. (ECF No. 20-5, at 1.)

[6] USM calculated the monetary amount of Nestle/Purina's underpayments by using the 2021 Study's measurements of overburden removed for the calendar years 2016, 2018, and 2019, totaling $1,214,612.10. (ECF No. 20-1 ¶ 60.)

**a. On May 28, 2021, USM Meets with Nestle/Purina to Request Data**

On May 18, 2021, USM presented the findings of Rish's 2021 Study to Nestle/Purina during an in-person meeting with Nestle/Purina's representatives. (ECF No. 20-1 ¶¶ 62–63.) After this briefing, Nestle/Purina's representatives informed the president of USM, Matt Heldreth, "that if it was determined that there had been an error, then [Nestle/Purina] would make good on any underpayment;" indeed, Nestle/Purina's Divisional Mining Manager Tony Parrish said that "if we missed something, we'll get you paid." (ECF No. 20-1 ¶ 63.) Nestle/Purina also asserted that it would instruct DAA "to release all aerial flight survey data to both USM and anyone USM chose to review the flight data" so USM could perform a thorough analysis. (ECF No. 20-1 ¶ 65.)

Relying "upon [Nestle/Purina's] assurance that it would be paid for any prior underpayments for overburden removed during the course of the 2010 contract," USM continued to "spend considerable sums" accumulating evidence to convince Nestle/Purina of its underpayment throughout the 2010 Contract period. (ECF No. 20-1 ¶ 66.) USM asked N/P Div. Mining Mgr. Parrish to instruct DAA to release the DAA data to Mike Anthony of Rish Equipment to review the photogrammetry, a request Mr. Parrish forwarded to DAA on June 3, 2021, with an instruction to "provide the necessary data." (ECF No. 20-1 ¶¶ 66–67.)

After several months without any substantive response to USM's request for data, Nestle/Purina emailed USM on November 3, 2021, stating that it "would not provide the data previously promised, that [Nestle/Purina] believed its prior measurements to be accurate and that the 2010 Contract did not require [Nestle/Purina] to provide any such data to USM." (ECF No. 20-1 ¶ 72.)

**b. After Their December 1, 2021 Meeting, USM's Subsequent Negotiations with Nestle/Purina Result in a Standstill**

USM responded to Nestle/Purina's November 3, 2021 email asking Mr. Parrish and Amy Kerr, a Nestle/Purina Vice President, for another meeting to further discuss disclosing "broad access to DAA's survey data." (ECF No. 20-1 ¶ 73.) The meeting ultimately took place on December 1, 2021. (ECF No. 20-1 ¶ 74.) During the meeting, USM reiterated its desire for full access to the DAA data to prove "it had been underpaid not only for the [three] years specifically addressed by the 2021 Study but also for all the other years covered by the 2010 Contract." (ECF No. 20-1 ¶ 75.) N/P VP Kerr instructed "Mr. Parrish to get USM what data it needed," and stated that "[i]f we owe you, we will pay you." (ECF No. 20-1 ¶ 77.) N/P VP Kerr's comments at the December 1, 2021 meeting form the basis of what is hereinafter referred to as the purported "2021 Oral Agreement."

However, just two weeks later during a December 15, 2021 meeting, N/P Div. Mining Mgr. Parrish "refused to provide" the DAA data to USM. (ECF No. 20-1 ¶ 80.) In a December 29, 2021 letter, USM accused Nestle/Purina of "stonewalling," of refusing to allow a "true reconciliation of the past aerial surveys," and of hiding "something" by its continued refusal to provide the DAA data. (ECF No. 20-1 ¶ 81; ECF No. 20-8, at 1.)

**c. On November 28, 2022, USM and Nestle/Purina Sign an Additional Letter Agreement to Release Limited DAA Data to USM's Contractors**

After sending the December 29, 2021 letter, USM did not hear from Nestle/Purina until February 15, 2022. (ECF No. 20-1 ¶¶ 81, 82.) On February 15, 2022, N/P Div. Mining Mgr. Parrish invited USM to attend a conference call to discuss hiring an independent third party jointly to analyze the DAA data. (ECF No. 20-1 ¶ 82.) On May 10, 2022, Mr. Parrish sent USM a proposed "Letter Agreement" for the transfer of the DAA data from Nestle/Purina "to move

forward with [USM's] request to review survey data." (ECF No. 20-1 ¶ 83.) In pertinent part, the May 12, 2022 proposed Letter Agreement contained a statute of limitations provision, stating:

> For the avoidance of doubt, nothing in this Letter Agreement shall be construed to amend, extend or otherwise modify the statute of limitations for any claim or cause of action related to the [2020 Contract] or [2010 Contract], or any conduct performed pursuant to either such agreement.

(ECF No. 20-9, at 2 (brackets in original).)

From June to August 2022, USM and Nestle/Purina discussed the details of a Latter Agreement in a series of negotiations, during which USM firmly requested that the final agreement not contain a statute of limitations provision regarding USM's ability to file a claim regarding potential breaches of the 2010 Contract. (ECF No. 20-1 ¶¶ 84–93.)

On July 28, 2022, N/P VP Kerr, along with two additional Nestle/Purina representatives, again met with USM. (ECF No. 20-1 ¶ 87.) In the meeting, USM reiterated that it had not received the DAA data from N/P Div. Mining Mgr. Parrish and that, without the DAA data, "USM could not give [Nestle/Purina] a concrete number of what [Nestle/Purina] owed USM." (ECF No. 20-1 ¶ 88.) At the meeting's conclusion, Ms. Kerr repeated her instruction that Mr. Parrish was to provide the DAA data and repeated her statement that "if we owe you, we will pay you." (ECF No. 20-1 ¶ 88.) N/P VP Kerr's comments at the July 28, 2022 meeting form the basis of what is hereinafter referred to as the purported "2022 Oral Agreement."

After that, on August 12, 2022, Nestle/Purina sent a new proposed Letter Agreement that reinstated the earlier statute of limitations language providing that nothing in the agreement would amend, extend, or modify the statute of limitations for any claim related to the 2010 and 2020 Contracts. (ECF No. 20-1 ¶¶ 89–90.) When Nestle/Purina counsel advocated for the statute of limitations language "because the statute of limitations had elapsed on some claims,"

USM responded that Nestle/Purina's in-house counsel should review N/P VP Kerr's statements because "she had stated on multiple occasions that if [Nestle/Purina] had been wrong [it] would make it right." (ECF No. 20-1 ¶ 91.) On August 23, 2022, N/P Div. Mining Mgr. Parrish emailed a letter of agreement that the parties had "reviewed in [their] meeting last week" in which "Section 9 [i.e. the statute of limitations provision)] ha[d] been deleted per [USM's] request." (ECF No. 20-1 ¶ 92.)

On November 28, 2022, after subsequent changes to the Letter Agreement, both parties agreed to the final version of the Letter Agreement (the "November 2022 Letter Agreement") in which Koontz Bryant Johnson Williams ("KBJW") was named as an independent third party charged with reviewing the DAA data. (ECF No. 20-1 ¶ 93; ECF No. 20-13, at 1.) This is the second reviewer engaged by Nestle/Purina. The November 2022 Letter Agreement did not contain a statute of limitations provision but did contain a stipulation stating that:

> The parties agree that should the Data indicate any discrepancy that would justify an increase or decrease in the amount owed to USM for overburden removal [between 2016 and 2021] they shall negotiate in good faith to mutually agree on a resolution.

(ECF No. 20-13, at 1.)

#### 5. In March 2023, USM and Nestle/Purina's Relations Falter Following KBJW's Final Report

In March 2023, KBJW provided both USM and Nestle/Purina with its final report ("the KBJW Report") analyzing the DAA data, concluding, in part, that "significant errors were made for the calculation of overburden" and that such errors "may have been made over multiple

years."[7] (ECF No. 20-14, at 17; *see* ECF No. 20-1 ¶ 109.) For example, KBJW's report surveyed USM's removal of overburden in 2020, 2021, and 2022. These surveys supported USM's assertion that DAA made errors in the calculation of the amount of overburden USM removed. (ECF No. 20-1 ¶ 98.) KBJW concluded that fluctuations in the DAA data "clearly indicate[d] that errors exist." (ECF No. 20-1 ¶ 109.)

On May 3, 2023, Nestle/Purina confirmed that it received the KBJW Report and, despite its previous agreement to use KBJW as an independent third-party, Nestle/Purina informed USM of its desire to retain its own surveyor to examine the DAA data and the accuracy of the KBJW Report. (ECF No. 20-1 ¶ 118; ECF No. 20-19, at 2.) Nestle/Purina's surveyor (now its third), Timmons Group ("Timmons"), produced its report on October 16, 2026. (ECF No. 20-18, at 2; *see* ECF No. 20-1 ¶ 120.) Timmons concluded that there were no errors in the DAA data. (ECF No. 20-18, at 3.) On October 25, 2023, a Nestle/Purina representative, Mackenzie Browning, met with USM President Heldreth to discuss Timmons' October report. Mr. Browning "indicated that the Timmons report was of such poor quality that he did not want to share it with Mr. Heldreth," and suggested that Timmons meet with KBJW instead. (ECF No. 20-1 ¶ 121.)

Subsequently, between October and December 2023, Timmons met with KBJW twice to discuss the DAA data and the contents of the KBJW report. (ECF No. 20-1 ¶¶ 122–127.) During this time, Timmons communicated with KBJW and USM that its findings were relatively consistent with the KBJW Report. (ECF No. 20-1 ¶¶ 119–29.) When asked by a KBJW employee on December 4, 2023, if anything in the KBJW Report was inaccurate, a Timmons

---

[7] The KBJW Report used DAA "topographic flight data for six end-of-year surveys" comprising the years "2015, 2016, 2018, 2019, 2020, and 2021." (ECF No. 20-14, at 1.) Nestle/Purina, however, did not authorize DAA to disclose "any data obtained prior to 2015 or any site boring logs" to KBJW. (ECF No. 20-1 ¶ 107.)

representative "only stated that he 'needed to do more calculations.'" (ECF No. 20-1 ¶ 128.) The Timmons representative further stated that Nestle/Purina was committed to "resolving" the issues between the parties and that "whatever we figure out as being the problem, they're willing to, you know, to step up and take care of whatever it is." (ECF No. 20-1 ¶¶ 129.)

On January 18, 2024, despite USM's expectations and shortly after Timmons had suggested otherwise, Timmons informed Nestle/Purina that it stood by its October report and the report's conclusion that there were no errors with the DAA data. (ECF No. 20-18, at 3.) On January 30, 2024, Nestle/Purina sent USM a letter that it "stands by the quantities determined by DAA in its prior measurements." (ECF No. 20-1 ¶ 131; *see* ECF No. 20-18, at 1.) USM responded on February 7, 2024, alleging that Nestle/Purina was engaging in "extreme bad faith" in its attempts to resolve their payment dispute and highlighting USM's firm belief that "it has not been fairly and fully compensated for the services that it has provided to [Nestle/Purina] since their contractual relationship began." (ECF No. 20-19, at 1, 6; *see* ECF No. 20-1 ¶ 133.)

### B. Procedural Background

On December 17, 2024, Defendants properly removed this case to this Court based on diversity jurisdiction under 28 U.S.C. § 1332. (ECF No. 1, at 2.) USM's original complaint contained nine counts of Breach of Contract against Nestle/Purina, alleging that Nestle/Purina breached the November 2021 Agreement, and one count of constructive fraud.[8] (ECF No. 1-1 ¶¶ 152–203.) On January 15, 2025, Nestle/Purina filed a timely Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). (ECF No. 7.) In its opinion granting the Motion to Dismiss without prejudice, the Court explained that USM's original complaint failed to state a

[8] In the Amended Complaint, USM does not seek to revive its constructive fraud claim. Accordingly, the Court does not discuss the constructive fraud claim here.

claim for breach of contract under Virginia law because (1) to the extent the claims were based on the purported 2021 Oral Agreement, USM failed to include that in its pleadings; (2) to the extent the 2011 through 2015 claims were based on the November 2022 Letter Agreement, that agreement only encompasses USM's performance for 2016 through 2021; (3) to the extent the claims were based on the November 2022 Letter Agreement, that agreement is an unenforceable agreement-to-agree; and (4) to the extent the claims were based on the 2010 Contract, USM conceded that Virginia's five-year statute of limitations barred the claims. (ECF No. 18, at 17, 18, 20, 24.)

The Court permitted USM to file a motion seeking leave to amend its complaint. (ECF No. 18, at 32.) On September 29, 2025, USM filed the instant Motion seeking leave to amend its complaint and attached the Amended Complaint and proposed exhibits. (ECF Nos. 20, 20-1–20-19.) The Amended Complaint alleges four categories of Breach of Contract claims:

> **(1) Counts I–VIII**: Nestle/Purina breached the purported 2021 Oral Agreement for 2011 through 2019;
>
> **(2) Counts IX–XVI**: Nestle/Purina breached the purported 2022 Oral Agreement for 2011 through 2019;
>
> **(3) Counts XVII–XIV**: Nestle/Purina breached the November 2022 Letter Agreement for 2011 through 2019; and,
>
> **(4) Count XXV**: Nestle/Purina breached the 2010 Contract for 2019.

(ECF No. 20-1 ¶¶ 145–294.)

## II. Standard of Review

Federal Rule of Civil Procedure 15(a)(2) instructs courts to "freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). The Supreme Court of the United States instructs courts to heed this mandate and freely allow amendments in the absence of considerations such as undue delay, bad faith, repeated failure to cure deficiencies, undue

prejudice to the opposing party, or futility of the amendment. *Foman v. Davis*, 371 U.S. 178, 182 (1962); *see also Edwards v. City of Goldsboro*, 178 F.3d 231, 242–43 (4th Cir. 1999) ("The law is well settled that leave to amend a pleading should be denied only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would be futile.") (internal quotations omitted).

Delay alone cannot sustain the denial of a motion seeking leave to amend when the delay does not result in prejudice to the opposing party, reflect bad faith, or accompany a futile amendment. *Edwards*, 178 F.3d at 242; *see also Smith v. Angelone*, 111 F.3d 1126, 1134 (4th Cir. 1997). Whether prejudice exists "will often be determined by the nature of the amendment and its timing." *Laber v. Harvey*, 438 F.3d 404, 427 (4th Cir. 2006). An amendment may cause prejudice when it raises a new legal theory requiring the opposing party to gather and analyze new facts shortly before trial. *Id.*, *see also Smith*, 111 F.3d at 1134. An amendment ordinarily will not prejudice the opposing party when it merely adds a theory based on facts already pled known to the parties. *Id.*

## III. Analysis

In the Motion, USM seeks leave to file the Amended Complaint. (ECF No. 20.) Because Nestle/Purina does not allege that USM seeks leave to amend for the purpose of undue delay, that amendment would unfairly prejudice Nestle/Purina, or that USM has acted in bad faith, the Court's determination turns entirely on whether the amendment is futile. (*See* ECF No. 26, at 2.) For the reasons articulated below, the Court determines that amendment is futile with respect to Counts I–XXIV of the Amended Complaint, but not as to Count XXV. Accordingly, the Court will grant in part and deny in part the Motion.

### A. Legal Standard: Futility

A proposed amendment is futile when it would not survive a motion to dismiss.[9] *See Perkins v. United States*, 55 F.3d 910, 917 (4th Cir. 1995). Because Rule 15 favors amendment, however, a court should deny leave to amend on the grounds of futility only when the proposed amendment is "clearly insufficient or frivolous on its face." *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 510 (4th Cir. 1986). Thus, when a proposed amendment sets forth facts and circumstances that may entitle the movant to relief, futility does not justify denial. *Smithfield Foods, Inc. v. United Food & Com. Workers Int'l Union*, 254 F.R.D. 274, 280 (E.D. Va. 2008). "[I]t is the possibility of recovery, and not its likelihood," that guides a court's analysis. *Id.*

### B. As to Counts I-XVI, Amendment Is Futile Because the Purported 2021 and 2022 Oral Agreements Do Not Evince a Meeting of the Minds and the Terms were Insufficiently Definite

Applying Rule 12(b)(6)'s standard to the Amended Complaint, Counts I through VIII fail to state a claim that Nestle/Purina breached its contractual duties formed by the 2021 Oral Agreement because no meeting of the minds occurred and the terms were insufficiently definite. Similarly, Counts IX through XVI fail to state a claim that Nestle/Purina breach its contractual duties formed by the 2022 Oral Agreement because there was no meeting of the minds and the terms were insufficiently definite. Accordingly, amendment would be futile as to Counts I through XVI of the Amended Complaint.

---

[9] In considering whether a proposed claim could survive a motion to dismiss, the Court assumes all well-pleaded factual allegations to be true and views them in the light most favorable to the pleader. *Mylan Lab'ys, Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). This principle applies only to factual allegations. The Court need not accept legal conclusions or conclusory allegations unsupported by sufficient factual matter. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). A proposed pleading must contain sufficient factual matter to state a claim that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

**1. Legal Standard: Oral Contracts Under Virginia Law**

"To prove a breach of an oral contract, [USM] must first prove that a valid oral contract existed." *Dean v. Morris*, 756 S.E.2d 430, 432 (Va. 2014). A valid oral contract requires clear and convincing evidence of an offer, acceptance, and valuable consideration. *Id.* at 432–33. "An offer, which is usually but not always a promise, is a manifestation of a willingness to enter into a bargain." *Chang v. First Colonial Sav. Bank*, 410 S.E.2d 928, 930–31 (Va. 1991) (citing Restatement (Second) of Contracts § 24). "An acceptance is an unconditional promise to be bound by the terms of the offer." *Adams v. Doughtie*, 63 Va. Cir. 505, 2003 WL 23140076, at *12 (Va. Cir. Ct. Dec. 31, 2003) (citing *Richmond Eng'r. v. Loth*, 115 S.E. 774, 786 (Va. 1923)). While a court should be reluctant to declare a contract void for indefiniteness and uncertainty, *Allen v. Aetna Cas. and Sur. Co.*, 281 S.E.2d 818, 820 (Va. 1981), for an oral contract to be valid, the terms of the offer must be reasonably definite, complete,[10] and certain[11] "to enable the parties and the courts to give the agreement exact meaning." *Richardson v. Richardson*, 392 S.E.2d 688, 690 (Va. Ct. App. 1990), *overruled on other grounds*, *Flanary v. Milton*, 556 S.E.2d 767, 768 (Va. 2002).

---

[10] An incomplete contract "is one from which one or more material terms have been entirely omitted. *Dean*, 756 S.E.2d at 433 (quoting *Smith v. Farrell*, 98 S.E.2d 3, 7 (Va. 1957)).

[11] "An uncertain contract is one which may, indeed, embrace all the material terms, but one of them is expressed in so inexact, indefinite, or obscure language that the intent of the parties cannot be sufficiently ascertained to enable the court to carry it into effect." *Dean*, 756 S.E.2d at 433 (quoting *Smith*, 98 S.E.2d at 7).

### 2. The Purported 2021 Oral Agreement Was Not a Valid Contract Because There Was No Meeting of the Minds and the Agreement's Terms Were Insufficiently Definite

In the Amended Complaint, USM alleges that, during the December 1, 2021 meeting, Nestle/Purina offered USM a contract through N/P VP Kerr which USM accepted. (ECF No. 20-1 ¶ 77.) As USM alleges, the essential terms of this offer were that Nestle/Purina was to provide the DAA data to USM and to pay USM for unpaid overburden. (ECF No. 20-1 ¶ 77.) In exchange, USM was "to forbear from immediately suing and to prove the quantities of overburden for which it was owed in return." (ECF No. 20-1 ¶ 77.)

USM's allegations are facially insufficient to establish that Nestle/Purina and USM entered an oral contract at the December 1, 2021 meeting. First, because Nestle/Purina did not manifest a willingness to enter into a binding contract, there was no valid offer. Although USM alleges that Nestle/Purina was an offeror, Nestle/Purina offered the DAA data on the promise that "if we owe you, we will pay you." (ECF No. 20-1 ¶ 77.) The statement "if we owe you, we will pay you" is equivocal. It indicates that Nestle/Purina will pay USM only *if* they are obligated to pay USM. Because it does not indicate under what circumstances Nestle/Purina would incur or accept such an obligation, the "offer" remains too vague to bind. *Allen*, 281 S.E.2d at 820.

Moreover, when Nestle/Purina refused to provide the DAA data on December 15, 2021, USM wrote a letter expressing frustration that Nestle/Purina "changed the narrative from [the parties'] earlier meeting with Amy Kerr [on December 1, 2021]," and suggested that the parties undergo mediation "in the hopes of keeping this amicable rather than adversarial." (ECF No. 20-8, at 1–2.) Nothing in this communication uses the words "breach," "contract," or similar vocabulary to describe the December 1, 2021 meeting, and nothing suggests either party viewed

Nestle/Purina as having made a specific offer to a contract at the meeting. *See Gulsen v. PNC Bank, Nat'l Ass'n*, No. 1:12-cv-202 (GBL), 2012 WL 13018998, at *6 (E.D. Va. July 9, 2012) ("Nothing in the Amended Complaint shows or supports any inference that the Defendant intended to be bound by any promise.").

Second, the terms of the 2021 Oral Agreement are insufficiently definite to establish a contract. *See Dean*, 756 S.E.2d at 433 (stating that "an incomplete contract [] is one from which one or more material terms have been entirely omitted") (quotations omitted). USM alleges that the statement "if we owe you, we will pay you" was a promise that "Nestle/Purina would pay USM for any quantity of overburden that USM was able to prove it had not yet been paid. (ECF No. 27, at 15; *see* ECF No. 20-1 ¶ 88.) USM fails to allege any agreement as to what methodology should be used to whether Nestle/Purina owed USM money. *See Sykes v. Brady-Bushey Ford, Inc.*, No. 04-225, 2005 WL 2787517, at *6 (Va. Cir. Ct. Oct. 27, 2005) ("[Defendant's] promise that the Plaintiff's 'losses would be covered' is not sufficiently clear to satisfy the legal requirement of certainty."). USM further fails to allege which party bore the burden of proving that whether Nestle/Purina owed money. Because the statement remains vague as to the parties' core dispute over what methodology properly captures the quantity of overburden removed, there is no "mutual assent of the contracting parties to terms reasonably certain under the circumstances [to] have an enforceable contract." *Allen*, 281 S.E.2d at 820 (noting that the lack of a specific sum or method to determine payment is too indefinite to create a contract).

Because USM's allegations that Nestle/Purina is liable for breach of contract for the purported 2021 Oral Agreement are facially insufficient, the Court must find that amendment is futile as to Counts I through VIII of the Amended Complaint.

### 3. The Purported 2022 Oral Agreement Was Not a Valid Contract Because There Was No Meeting of the Minds and the Agreement's Terms Were Insufficiently Definite

In the Amended Complaint, USM alleges that during the July 28, 2022 meeting, Nestle/Purina offered USM a contract through N/P VP Kerr which USM accepted. (ECF No. 20-1 ¶ 88.) Mirroring the 2021 Oral Agreement, USM alleges that the essential terms of the purported 2022 Oral Agreement were that Nestle/Purina was to provide the DAA data to USM and to pay USM for unpaid overburden; in exchange, "[Nestle/Purina] was to provide data, USM was to use the data to make a determination of the actual quantity of overburden it had removed and Nestle/Purina would pay USM for any quantity of overburden that USM was able to prove it had not yet been paid." (ECF No. 27, at 15; *see* ECF No. 20-1 ¶ 88.)

As with the purported 2021 Oral Agreement, USM's allegations insufficiently establish that Nestle/Purina and USM entered an oral contract during the December 1, 2021 meeting. First, because Nestle/Purina did not manifest an intent to be bound by a contract, the allegations do not establish a meeting of the minds. As is true with the 2021 Oral Agreement, Ms. Kerr's statement that "if we owe you, we will pay you" is equivocal and does not manifest any specific obligations. (ECF No. 20-1 ¶ 88.)

Moreover, as USM acknowledges, the parties' July 28, 2022 meeting was conducted as part of the negotiation process that culminated in the November 2022 Letter Agreement. (ECF No. 20-1 ¶¶ 84–86.) The parties exchanged proposed agreements addressing the same subject matter as the July 28, 2022 meeting both immediately before and after the meeting.[12] The fact

[12] The parties exchanged two draft agreements prior to the July 28, 2022 meeting and one afterward. Nestle/Purina sent a draft agreement on May 10, 2022, and USM responded with their own draft on June 22, 2022, before the July 28, 2022 meeting. (ECF No. 20-1 ¶¶ 84–86.) After the meeting, the parties met again over the phone and then, on August 15, 2022, Nestle/Purina sent another revised draft. (ECF No. 20-1 ¶ 89.)

that the parties continued negotiations on the November 2022 Letter Agreement after the July 28, 2022 meeting plainly establishes that the parties *did not* understand the July 28, 2022 meeting to have resolved their issues.[13]

Second, the terms of the 2022 Oral Agreement are insufficiently definite to establish a contract. The terms of the 2022 Oral Agreement mirror those in the 2021 Oral Agreement, except that USM was not required to forego litigation. (*See* ECF No. 20-1 ¶ 88.) Accordingly, the terms of the 2022 Oral Agreement are insufficiently definite to form a contract for the same reasons as the 2021 Oral Agreement remained too vague. *See supra* Section III(B)(2).

Because USM's allegations that Nestle/Purina is liable for breach of contract for the purported 2022 Oral Agreement are facially insufficient, the Court must find that amendment is futile as to Counts IX through XVI of the Amended Complaint.

### C. As to Counts XVII–XXIV, Amendment Is Futile for the Reasons Articulated in the Court's Memorandum Opinion on Nestle/Purina's Motion to Dismiss

Applying Rule 12(b)(6)'s standard to the Amended Complaint, Counts XVII through XXIV still fail to state a claim for breach of contract based on the November 2022 Letter Agreement.

[13] USM asserts "[t]hat the July 2022 meeting occurred in the course of negotiating terms for what became the November 2022 Letter Agreement does not mean that the parties could not enter into an oral agreement in July 2022." (ECF No. 27, at 17.) But this argument misses the mark.

The ongoing negotiations of what would become the November 2022 Letter Agreement is relevant context not because it deprived Nestle/Purina of the ability to contract with USM, but because it evinces Nestle/Purina and USM's shared understanding that they had not yet entered a contract governing the release of the DAA data. This is reinforced by the fact that neither of the parties reference the purported 2022 Oral Agreement as having created a binding contract in the parties' subsequent negotiations. (*See* ECF Nos. 20-11, 20-12.)

In Counts XVII through XXIV, "USM reasserts its claims based on the November [2022 Letter] Agreement for all eight impacted years." (ECF No. 21, at 2.) These Counts are substantively identical to Counts I through VIII of the original complaint, which the Court squarely rejected in the September 15, 2025 Motion to Dismiss Memorandum Opinion (the "2025 Opinion").[14] (ECF No. 18, at 18–24.) Accordingly, amendment is futile as to Counts XVII through XXIV.

Counts XVII through XXI of the Amended Complaint address years *2011 through 2015*. *See* ECF No. 20-1 ¶¶ 241–270. The Court previously held that the original complaint's materially identical Counts failed to state a claim under the November 2022 Letter Agreement because the November 2022 Letter Agreement "unambiguously applies [only] to the years *2016 through 2021*." 2025 Opinion, (ECF No. 18, at 19) (emphasis added). USM does not provide any additional facts to change the Court's decision. Indeed, USM candidly concedes that it only included these duplicative counts in the Amended Complaint "to [ensure] that the claims for those years are preserved in the event of any later appeal." (ECF No. 21, at 2.) Accordingly, the Court incorporates the reasoning and findings in its earlier decision here. 2025 Opinion, (ECF No. 18, at 18–20.)

Counts XXII through XXIV address the years 2016, 2018, and 2019. (*See* ECF No. 20-1 ¶¶ 271–288). The Court previously held that the original complaint's substantively identical Counts failed to state a claim under the November 2022 Letter Agreement because the agreement is "an unenforceable agreement to agree." 2025 Opinion, (ECF No. 18, at 20.) Although USM urges the Court to reconsider its prior conclusion, USM does not provide any additional material

---

[14] For the reasons discussed *infra* in Section III(D), the Court does not find that the law of the case doctrine binds it to its earlier findings in the 2025 Opinion, (ECF No. 18).

facts[15] in its Amended Complaint. Accordingly, amendment is futile as to Counts XXII through XXIV of the Amended Complaint.[16]

**D. Amendment to Count XXV is Not Futile Because USM's Claim That the Claim Accrued in 2020—Fewer than Five Years Before USM Brought Suit—Is Not Frivolous on Its Face**

In Count XXV of the Amended Complaint, USM alleges that Nestle/Purina breached its contractual obligation under the 2010 Contract by failing to "pay USM for all overburden removed in 2019 that is in excess of the reconciliation prepared and presented by [Nestle/Purina] in early 2020." (ECF No. 20-1 ¶ 292.) This claim is not frivolous on its face, and therefore amendment is not futile as to Count XXV.

[15] The Amended Complaint alleges new facts—which the Court has considered—absent from the original Complaint to support its claims under the purported 2021 Oral Contract, (*see* ECF No. 20-1 ¶¶ 77–78), and under the purported 2022 Oral Contract, (*see* ECF No. 20-1 ¶ 88), but not in support of its claims under the November 2022 Letter Agreement. The Amended Complaint adds summaries of Paragraphs 3, 4, and 6 of the November 2022 Letter Agreement, but because the November 2022 Letter Agreement was appended to the original Complaint in its entirety, (ECF No. 1-1, at 239–243), the Court already considered the entirety of the agreement in concluding that it is unenforceable. 2025 Opinion, (ECF No. 18, at 20–23.)

[16] In USM's Reply, USM contends that amendment would not be futile because USM's claim that Nestle/Purina is equitably estopped from asserting that the 2016, 2017, 2018, and 2019 claims are time barred is not frivolous. (ECF No. 27, at 7.) However, other than in Count XXV, the Amended Complaint only alleges that Nestle/Purina breached an alleged 2021 oral contract, (ECF No. 20-1 ¶¶ 145–192), an alleged 2022 oral contract, (ECF No. 20-1 ¶¶ 193–240), or an alleged 2022 written contract, (ECF No. 20-1 ¶¶ 241–288). "The Court does not rely on the statute of limitations in concluding that none of USM's breach of contract claims [except for Count XXV] survive." (ECF No. 18, at 25 n.15.) "As a result, this Court need not, and does not, address the merits of USM's equitable estoppel argument." (ECF No. 18, at 25 n.15.)

### 1. Law of the Case Doctrine Does Not Preclude the Court from Considering Claim XXV

As a threshold matter, Nestle/Purina posits that the Court already ruled that Claim XXV, asserting a claim for breach of the 2010 contract, is time barred.[17] (ECF No. 26, at 7.) Nestle/Purina maintains that "[t]he law of the case doctrine applies" to Count XXV, and "[t]o allow USM a second bite at the apple under these circumstances would sanction dilatory conduct and invite gamesmanship." (ECF No. 26, at 8.) The Court disagrees.

The law of the case doctrine refers to the principle that, "when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800 (1988). "The law of the case is a rule of discretion and not a jurisdictional requirement." *Smith v. Bounds*, 813 F.2d 1299, 1304 (4th Cir. 1987). "The law of the case doctrine sensibly does not bar a district court from reconsidering its own rulings in a case, although this should only occur relatively infrequently." *Brown v. Slenker*, 197 F. Supp. 2d 497, 504 (E.D. Va. 2002). Law of the case principles "are a matter of practice that rests on good sense and the desire to protect both court and parties against the burdens of repeated reargument by indefatigable diehards." *Produce All. v. Let-Us Produce*,

---

[17] In addition to arguing that the Court's prior ruling that USM waived its statute of limitations arguments is the law of the case, Nestle/Purina also contends that "USM's Motion with respect to [Count XXV] is, in effect, a motion for reconsideration [governed by Rule 60(b)]." (ECF No. 26, at 6.) Nestle/Purina is incorrect. "When a district court dismisses a complaint or all claims without granting leave to amend, its order is final and appealable" and thus a party seeking reconsideration must move under Federal Rules of Civil Procedure 59 and 60. *See Britt v. DeJoy*, 45 F.4th 790, 791 (4th Cir. 2022).

In contrast, "reconsideration of interlocutory orders [is] not subject to the strict standards applicable to motions for reconsideration of a final judgment." *American Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 514 (4th Cir. 2003). The power to reconsider interlocutory orders "is committed to the discretion of the district court . . . and doctrines such as law of the case . . . have evolved as a means of guiding that discretion." *Id.* at 515 (citations omitted).

No. 2:10-cv-198 (MSD), 2012 WL 13028293, at *1 (E.D. Va. Jan. 24, 2012) (quotation omitted); *see Christianson*, 486 U.S. at 816 n.5 ("Perpetual litigation of any issue . . . delays, and therefore threatens to deny, justice."). The law of the case has the most force when the ruling at issue was issued by an appellate court, where it operates as a mandate against reconsideration, *United States v. Lentz*, 384 F. Supp. 2d 934, 939 (E.D. Va. 2005), but has lesser force when the ruling was issued by a coordinate court, and even less force still when it was issued by the same district court, *Brown*, 197 F. Supp. 2d at 504.

Whether Virginia's five-year statute of limitations bars USM's claims is an issue of law. Thus, the law of the case doctrine applies to the Court's ruling that USM's claims based on the 2010 Contract are time barred. (ECF No. 18, at 15 n.2.) Nevertheless, because the circumstances here weigh in favor of allowing USM to present its statute of limitations arguments, the Court will not rely on the law of the case.

First, the Court's prior ruling on the statute of limitations issue was based on USM's concession, not on a substantive analysis of the issue. Therefore, the Court's interest in reaching the legally correct answer is greater, and the coordinate concern that the Court threatens the stability of its earlier ruling is less. While a court should be "loathe" to revisit earlier findings in the same case, that circumscription cannot apply when the issue has not yet been reached at all, much less by an appellate court. *See Produce All.*, 2012 WL 13028293, at *2.

Also, because the Court has not yet undertaken a substantive analysis of the statute of limitations issue, the threat that reconsideration breeds "perpetual litigation" is allayed. The statute of limitations issue has not been properly presented for substantive litigation at in the first instance. Because the case is still at the pleading stage, the statute of limitations remains unassessed by the Court, and USM asked the Court to consider the issue within a reasonable

timeframe from the Court's finding that the issue was conceded, USM has not engaged in dilatory conduct in bringing this claim now. The Court proceeds with its analysis.

### 2. On the Merits, Count XXV Is Not Clearly Barred by the Statute of Limitations

Count XXV is not on its face clearly time barred.[18] Under Virginia law, the statute of limitations for a breach of contract is five years starting at the date of the alleged breach. Va. Code § 8.01-246(2). "[C]ourts generally have agreed that for claims based on an installment contract, a cause of action accrues, and the statute of limitations begins to run, when each installment becomes due." *Am. Inn, L.P. v. SunTrust Banks, Inc.*, 28 F. App'x 316, 320 (4th Cir. 2002) (citation omitted). However, when the breach consists of a single continuous act, as opposed to a series of separate breaches, "the limitations period runs from the inception of [the initial] breach, even when the breach continues for years." *Fluor Fed. Sols., LLC v. PAE Applied Techs., LLC*, 728 F. App'x 200, 202 (4th Cir. 2018).

USM argues that the breach itself was the reconciliation underpayment, not Nestle/Purina's faulty reliance on the DAA data. (ECF No. 27, at 5–6.) USM thus argues that their claims are subject to the ordinary rule governing breaches of installment contracts and that the statute of limitations began to run for each year separately when the underpayment occurred. (ECF No. 27, at 6.) USM alleges that the reconciliation period for 2019 occurred in early 2020, (ECF 20-1 ¶ 46), so that is when Count XXV's breach claim accrued and the statute of limitations had not elapsed by November 2024, when USM filed suit, (ECF No. 27, at 6).

---

[18] In its opposition, Nestle/Purina asserts that Count XXV of the Amended Complaint will be futile solely because the law of the case doctrine instructs that the Court already ruled against USM on the statute of limitations. In fairness to the parties and to create a full record, the Court relies on Nestle/Purina's briefing from the Motion to Dismiss (and USM's arguments here) to determine whether amendment would be futile.

Nestle/Purina argued in its Motion to Dismiss that the alleged breach was the result of a single continuous action: "[Nestle/Purina's] use of an allegedly improper method for calculating the amount of overburden removed." (ECF No. 8, at 14.) Therefore, the limitations period began to run as soon as Nestle/Purina began to rely on its own data to determine the overburden reconciliation amount, which happened in 2012. (ECF No. 8, at 15.)

The Court cannot find that USM's argument about when the statute of limitations began to run on Count XXV is "clearly insufficient or frivolous on its face," *Johnson*, 785 F.2d at 510, or that Count XXV would fail to survive a motion to dismiss, *Save Our Sound OBX*, 914 F.3d at 228. Consequently, the Amended Complaint cannot be deemed futile and the Court will grant the Motion with respect to Count XXV. (ECF No. 20.) The Court expresses no view regarding Count XXV's ultimate merits.

## IV. Conclusion

Amendment of USM's complaint would be futile as to Counts I through VIII because the Amended Complaint fails to state a claim for breach of the purported 2021 Oral Agreement, as to Counts IX through XVI because the Amended Complaint fails to state a claim for breach of the purported 2022 Oral Agreement. Moreover, Counts XVII through XXIV of the Amended Complaint fail to state a claim for breach of the November 2022 Letter Agreement.

However, amendment would not be futile as to Count XXV for breach of the 2010 Contract. As a result, the Court will deny the Motion with prejudice with respect to Counts I through XXIV and grant the Motion with respect to Count XXV.

An appropriate order shall issue.

/s/
M. Hannah Lauck
Chief United States District Judge

Date: 9/30/26
Richmond, Virginia